**AEROJET–GENERAL CORPORATION,**
Plaintiff-Appellee,

v.

**Reubin O'Donovan ASKEW, Governor of the State of Florida, et al., Defendants-Appellants.**

No. 31018.

United States Court of Appeals,
Fifth Circuit.

Dec. 9, 1971.

Rehearing and Rehearing En Banc
Feb. 2, 1972.

**820**

---

Robert L. Shevin, Atty. Gen., Fla., Ronald W. Sabo, Asst. Atty. Gen., Philip S. Bennett, Gen. Counsel, State Bd. of Trustees of the Internal Improvement Trust Fund, Stephen Marc Slepin, Counsel, State Bd. of Ed., Rivers Buford, Jr., Gen. Counsel, State Bd. of Ed., Tallahassee, Fla., Marion E. Sibley, Sp. Asst. Atty. Gen., Miami Beach, Fla., for defendants-appellants.

George W. Wright, Jr., Karl B. Block, Jr., Miami, Fla., for plaintiff-appellee.

Before GODBOLD, SIMPSON and CLARK, Circuit Judges.

SIMPSON, Circuit Judge:

The Aerojet-General Corporation (plaintiff), an Ohio corporation doing business in the State of Florida, brought suit in the district court against the State Board of Trustees of the Internal Improvement Trust Fund and the State Board of Education (defendants),[1] seeking specific performance of an option to purchase approximately 25,313 acres of land in Dade County, Florida. The defendants entered a general appearance and interposed several affirmative defenses. The district court granted a summary judgment in favor of the plaintiff and ordered the defendants to convey to the plaintiff the specified real estate. Aerojet-General Corporation v. Kirk, 1970, N.D.Fla., 318 F.Supp. 55.

---

1. The following officials of the State of Florida compose the State Board of Education as well as the separate Board of Trustees of the Internal Improvement Trust Fund: Governor, Secretary of State, Attorney-General, Comptroller, Treasurer, Commissioner of Agriculture, and Commissioner of Education. Fla. Stat., Secs. 229.012 and 253.02(1), F.S.A.

Timely appeal to this Court followed. We affirm the district court.

In September and October, 1961, the defendants' predecessors in office caused to be published in the Homestead News, a newspaper of general circulation in Dade County, Florida, a Notice of Bids and Public Sale[2] by means of which bids competitive bids will be received at 10:00 A.M. (E.S.T.), on *OCTOBER 24, A.D., 1961,* in the Board Room of the Governor's Office in the State Capitol Building, Tallahassee, Florida for a ten-year lease with option to purchase, subject to provisions set forth herein, all of the following described lands in Dade County, Florida, to-wit:

2. The text of the Notice was:

"NOTICE

BIDS TO BE RECEIVED
PUBLIC SALE

In pursuance of authorizations by the State Board of Education of Florida and Trustees of the Internal Improvement Fund of the State of Florida, respectively,

| Description | Twp. S. | Rge. E. | Acreage | Owner |
|---|---|---|---|---|
| Sections 1 through 14 | 56 | 37 | 8960 | Tr. I. I. Fund |
| Sections 15 and 16 | 56 | 37 | 1280 | Bd. of Ed. |
| Sections 17 through 20 | 56 | 37 | 2560 | Tr. I. I. Fund |
| Sections 21 through 23 | 56 | 37 | 1920 | Bd. of Ed. |
| Sections 24 through 36 | 56 | 37 | 8320 | Tr. I. I. Fund |
| Section 16 | 57 | 37 | 640 | Bd. of Ed. |
| W ½ of Section 5 | 59 | 38 | 328 | Tr. I. I. Fund |
| Section 6 | 59 | 38 | 665 | Tr. I. I. Fund |
| Section 16 | 59 | 38 | 640 | Bd. of Ed. |

Total acreage including estimated area of unsurveyed sections _ _ _ 25,313 acres.

which ten-year lease with option to purchase, if awarded, will require lessee-optionee to make payment of rental annually in advance during the lease term at the rate per acre at which award is made, also to make payment during the lease term to appropriate public agencies of an annual sum equal to any and all ad valorem taxes which would be due and payable if all of said lands and improvements thereon were owned in fee simple by such lessee-optionee. Under the lease-option lessee-optionee may during its ten-year consummate purchase of all of said lands at the price bid and upon which award is made by full payment of total purchase price for deed, or by execution of purchase contract whereunder 20% of total purchase price shall be payable in cash on execution of contract, with balance in ten equal·consecutive annual installments with interest on unpaid balance at 5% per annum. Neither the lease-option nor purchase contract will be subject to assignment without formal approval of both the Board of Education and said Trustees. Instrument of conveyance will contain all applicable statutory rights and reservations in effect on its date. Lessee-optionee will be required by covenant to commence, within a reasonable period of time, construction and installation of a manufacturing plant and associated facilities on said land or upon lands contiguous thereto and owned, leased or controlled by lessee-optionee, and to utilize above described land for operation of its manufacturing plant and associated facilities, and shall not, during the full period of ten years from date of the lease-option use any of said land for land speculation purposes without formal approval of both of the two said State Boards.

Bids must specify offer for both (1) annual lease rental per acre and (2) price per acre for option to purchase.

Bids for lease-option of less than the entire acreage above described will not be eligible for consideration.

Mailed bids must be directed to the State Land Office, Room 114, The Capitol, Tallahassee, Florida, and each mailed bid accompanied by certified or cashier's check in amount equal to the annual rental as bid for the entire acreage, payable to "Board of Education and Trustees of Internal Improvement Fund." Bidders may attach brief statement of nature of their intended operations for use of said lands. A purpose of this offering is to motivate establishment of facilities and production in the interest of the economy of Florida and National defense.

Oral competitive bidding for lease-option of the entire acreage (public auc-

were solicited for the lease of lands owned by the defendants in Dade County, Florida. On December 21, 1961, the plaintiff and the defendants' predeces- sors in office entered into a written lease with option to purchase the leased lands at $50.00 per acre.[3] An amendment to paragraph three of the lease

tion) is scheduled to commence at the time and place stated first above, following the opening and reading of all mailed bids. The highest mailed bid, in compliance with the requirements herein, will become the starting offer for oral bidding from the floor. Bidders present may raise their written or oral offers. Highest bidder will be required to sign memorandum evidencing such bid and submit certified or cashier's check in amount not less than annual rental for one year for the entire acreage within 24 hours after award is made.

The right to reject any and all bids is reserved. Checks submitted by unsuccessful bidders will be promptly returned after consideration of the bids. In the event of award and upon execution of the lease-option the check tendered by the successful bidder will be credited as paid rental for the period of time covered by such amount.

In the event an award is made and development and use for said purpose shall not be commenced within twelve months after date of lease-option, the said lease-option will then become subject to cancellation at the discretion of the two State owner-boards.

The above described lands include unsurveyed sections and estimated acreage and lessee-optionee will have the right by field survey made at the expense of lessee-optionee and by a Registered Land Surveyor or Certified Public Land Surveyor, approved by the two State Boards to establish a more accurate total acreage. In such event subsequent rentals or purchase payments shall be adjusted in accordance with the corrected total acreage.

BY ORDERS of the State Board of Education and Trustees of the Internal Improvement Fund."

3. This instrument entitled "Lease with Option to Purchase" recites that it was made December 21, 1961, "by and between the State of Florida, by and through the Trustees of the Internal Improvement Fund of the State of Florida, and the State Board of Education of Florida, component state agencies of the State of Florida, with offices located in Tallahassee, Leon County, Florida, and Aerojet-General Corporation, a corporation organized and existing under the laws of the State of Ohio, with principal place of business in Azusa, Los Angeles County, California". It recites in a series of "Whereas" clauses (a) that the two state agencies are vested with title to certain lands in Dade County, Florida, and are charged with the administration, management, control, supervision, conservation and protection of those lands; and (b) that said agencies have been advised by Aerojet-General Corporation that it has a need for a large tract of land consisting in part of these State lands for the purpose of establishing a manufacturing plant and associated facilities to be used in production activities designed to strengthen the defense posture of the United States, and (c) that since the best interests of the people of Florida will be served by said State lands being devoted to such usage, the said agencies have in compliance with statutory requirements of Florida taken such action as was necessary to permit the use of the State lands as aforesaid, and (d) all statutory requirements have been satisfied and all necessary action taken, the said component state agencies of the State of Florida are authorized and empowered to enter into this agreement and authorize its execution.

It was then recited that it was mutually understood and agreed that in consideration of the sum of $10.00 paid by each party to the other, and in further consideration of the mutual covenants of the respective parties, that it was agreed between the component state agencies of the State of Florida thereinafter referred to as "Lessor" and Aerojet-General Corporation, thereinafter referred to as "Lessee", as follows:

1. That the Lessor leases the following described land, situate in Dade County, Florida, the ownership of said land being indicated opposite the description: (Here followed the description by section, township and range of the 25,313 acres of land involved, with ownership of some parcels attributed to "Trustees, I.I.F.", and some portions attributed to "Board of Education"), to have and to hold for a period of ten years from date thereof upon the following terms and conditions, part of which we will paraphrase and part of which, indicated by quotation marks, we will quote verbatim:

2. This paragraph contained the Lessee's agreement to pay an amount equal to the sum of $2.50 per acre during the lease unless the lease was sooner termi-

nated or cancelled as provided for therein, in advance, the first payment to be on execution of the agreement with subsequent payments on each anniversay date thereafter.

3. "The Lessee herewith agrees and covenants to commence within twelve (12) months after the execution hereof, the construction and installation of a manufacturing plant and associated facilities on said land or upon lands contiguous thereto owned, leased or controlled by Lessee and in so doing to utilize the aforementioned described land in conjunction with the operation of such manufacturing plant and associated facilities."

4. "The Lessor shall have the right to cancel this lease upon breach or failure of Lessee to comply with any of the covenants herein agreed to be kept or performed by Lessee. However, in the event of such breach or failure on the part of Lessee, Lessor shall give Lessee sixty (60) days notice, in writing, of its intention to cancel this lease and thereupon, unless such breach or failure be cured by Lessee within said sixty (60) day period, this lease and the terms hereof shall expire and come to an end on the date fixed in such notice as if the said date were the date originally fixed in this lease for the expiration thereof.

"It is mutually understood and agreed that this lease shall terminate if option to purchase said lands hereinafter granted by Lessor to Lessee is exercised by Lessee and that in such event no covenant herein made on the part of Lessee shall extend beyond such termination of this lease excepting the covenant of Lessee contained in paragraph 5 next below."

5. "The Lessee agrees and herewith covenants that the land herein leased and for which an option to purchase is herein granted shall not be used by Lessee for purposes of land speculation in any manner whatsoever for a period of ten (10) years next following the execution of this Agreement without written approval of Lessor first had and obtained."

6. This paragraph provided that improvements of every kind and nature placed on the lands during the term of the lease should be, in all legal intendment, as between parties, considered the personal property of the Lessee and provided for their removal by the Lessee upon the expiration or cancellation of the lease, or in the alternative for their abandonment by the Lessee, in which latter event the title was to pass to Lessor.

7. This paragraph provided for the payment annually by the Lessee to the proper public agencies a sum of money equal to and considered as in lieu of ad valorem taxes which would be payable on the lands if title thereto were owned in fee by the Lessee, and further to pay any valid special assessment levied on said lands. These payments were to continue through the lease period or until purchase of the lands by the Lessee as provided in the lease. Procedure for compliance with these provisions was made the responsibility of the Lessee in cooperation with local government agencies.

8. "The Lessor herewith grants to the Lessee the exclusive right, option and privilege to purchase all of the land described herein at any time within the ten (10) year lease period at and for a price of Fifty Dollars ($50.00) per acre. In the event the Lessee exercises its right, option and privilege to purchase the above described land, the purchase price of said land to be determined by the number of acres multiplied by Fifty Dollars ($50.-00), less the amount of any unearned rent paid by Lessee under the terms of this lease shall be payable as follows:

(a) Upon the election of Lessee, the total amount of the purchase price to be determined, as aforesaid, shall be paid to Lessor simultaneously with delivery to Lessee of a deed to said lands vesting good and merchantable fee simple title thereto in Lessee subject only to applicable statutory rights and reservations in effect on date of conveyance and the covenant on the part of Lessee to be kept and performed contained in paragraph 5 above, or

(b) Upon election of Lessee, the Payment of any amount equal to or in excess of twenty per cent (20%) of the total purchase price to be determined, as aforesaid, shall be paid to Lessor simultaneously with the execution of a contract to purchase by and between the parties hereto, which contract to purchase shall provide for a promissory note for an amount equal to the unpaid balance due to Lessor from Lessee for purchase price of said lands described herein, which note shall be paid to Lessor by Lessee in ten (10) equal and consecutive annual installments together with interest on the unpaid balance thereof at the rate of five per cent (5%) per annum. Lessee shall have the express right and privilege to pay up to and including the entire unpaid balance of any promissory note representative of the unpaid balance of the purchase price at any time after the execution thereof, without penalty. Upon payment to Lessor by Lessee of the promissory note representing the bal-

was executed by the parties on January 14, 1963.[4]

ance due on contract to purchase, the Lessor agrees to deliver to said Lessee a fee simple deed to said lands vesting good and merchantable fee simple title in Lessee, subject only to the applicable statutory rights and reservations in effect on date of the contract to purchase and the covenant of Lessee contained in paragraph 5 above."

9. This paragraph required the written approval of the Lessor for assignment of the lease by the Lessee.

10. This paragraph contained the usual Lessee covenant to hold the Lessor harmless from liability resulting from the Lessee's operations "under the terms of this lease prior to exercise of option herein granted to purchase the land herein described".

11. This paragraph obligated the Lessee to grant easements and rights of entry upon the land to the Central and Southern Florida Flood Control District, or its successor, as needed or required to make or construct canals, cuts, sluiceways, dikes and other such works.

The instrument was concluded with the usual formal signature clause.

4. This instrument read as follows:

"AMENDMENT TO PARAGRAPH THREE OF LEASE WITH OPTION TO PURCHASE

"WHEREAS, on December 21, 1961, the Trustees of the Internal Improvement Fund of the State of Florida and the State Board of Education of Florida, as Lessor, entered into a Lease with Option to Purchase with Aerojet-General Corporation, as Lessee, for certain land situate in Dade County, Florida, and comprising approximately 25,313 acres, and

WHEREAS, Lessee, in Paragraph Three of the Lease with Option to Purchase above referred to, agrees and covenants to commence construction and installation of a manufacturing plant and associated facilities on the lands described in the Agreement or upon lands contiguous thereto, owned, leased or controlled by Lessee, within twelve months from the date of execution of said Lease with Option to Purchase, and

WHEREAS, prior to December 21, 1962, Lessee expended considerable funds in order to commence the actual building construction and installation of such facilities, including extensive grading and foundation work; however, in order to

In addition to leasing the subject land from defendants, the plaintiff purchased

eliminate any question as to whether Paragraph Three has been complied with, Lessee has heretofore submitted formal request to Lessor for modification of Paragraph Three of the instrument of Lease with Option to Purchase so as to grant an additional period of time of two years within which to commence construction and installation of a manufacturing plant as provided in this paragraph, and

WHEREAS, the Trustees of the Internal Improvement Fund and the State Board of Education of Florida did consider this request at the meetings of said agencies held on October 9, 1962, and did determine and agree that it would best serve the interests of all parties to the Agreement as well as the public interest to approve this request for additional time.

NOW, THEREFORE, that for and in consideration of the sum of TEN DOLLARS ($10.00) paid by each party hereto to the other, receipt of which the parties each and severally acknowledge, and in further consideration of the mutual covenants of the respective parties hereto, it is hereby agreed by and between the Trustees of the Internal Improvement Fund of the State of Florida and the State Board of Education of Florida, component state agencies of the State of Florida, referred to in the above mentioned Lease with Option to Purchase as 'Lessor', and Aerojet-General Corporation, referred to in same as 'Lessee', as follows:

1. That Paragraph Three of said Lease with Option to Purchase dated December 21, 1961, by and between the parties hereto, be and the same hereby is amended in its entirety to read as follows:

'3. The Lessee herewith agrees and covenants to commence prior to December 21, 1964, the construction and installation of a manufacturing plant and associated facilities on said land or upon lands contiguous thereto owned, leased or controlled by Lessee and in so doing to utilize the aforementioned described land in conjunction with the operation of such manufacturing plant and associated facilities.'

2. That, except as provided in Paragraph One above, all of the terms, covenants, and conditions of said Lease with Option to Purchase dated December 21, 1961, shall remain the same.

IN WITNESS WHEREOF, the Trustees of the Internal Improvement Fund and the State Board of Education, here-

additional land surrounding the defendants' lands, at an expenditure of $7,-100,000. In early 1962, plaintiff began construction of a plant for the development of solid rocket fuels, which resulted in a capital investment on the plaintiff's part for buildings and equipment of $21,200,000. About $2,000,000 of this construction was located on the land leased from the Board of Education and the Board of Trustees of the Internal Improvement Trust Fund. The plant was completed in the spring of 1964 and was in operation until June, 1967, at which time it ceased operations due to cutbacks in the federal government's spending on solid rocket fuel research and development. Since that time the plaintiff has maintained a caretaker force of fourteen people at the plant.

On September 8, 1969, the plaintiff notified each of the defendants in writing [5] that it had elected to exercise its option to purchase the lands which are the subject of the lease. Prior to that date, the plaintiff had paid over $500,000 in yearly rentals under the lease to the defendants and $231,000 under Paragraph 7 of the lease to Dade County in lieu of ad valorem taxes. Payments under the lease were current in all respects. At no time prior to the "notify date", September 8, 1969, had the defendants or their predecessors in office ever notified plaintiff or even intimated to it that plaintiff had failed in any way whatever to comply with the terms of the lease. No objection was made prior to that time to the reduction in work force caused by the shutdown in operations of June, 1967. At a meeting of the State Board of Education and of the Board of Trustees of the Internal Improvement Trust Fund on October 21, 1969, it was decided not to convey the land to the plaintiff. This suit to compel conveyance of the property was instituted that same day.

The complaint for specific performance recited the terms of the lease and the plaintiff's attempt to exercise its option to purchase. It asserted that the plaintiff was ready, willing, and able to pay the required amount of the purchase price simultaneously with the execution of a contract to purchase between the plaintiff and the defendants, but that

---

inabove and in said Lease with Option to Purchase referred to as Lessor, have hereunto set their hands and affixed their respective seals and the seal of the Commissioner of Agriculture of the State of Florida and Aerojet-General Corporation, hereinabove and in said Lease with Option to Purchase referred to as Lessee, has caused its name to be signed by its duly authorized officers and attested by its Secretary and affixed its corporate seal, in triplicate, this *14th* day of January, 1963."

5. The letter to the State Board of Education was as follows:
 "State Board of Education
 Capitol Building
 Tallahassee, Florida
 Attention: Mr. Floyd T. Christian
 Commissioner of Education
 Reference: Lease with Option to Purchase dated December 21, 1961, between Trustees of the Internal Improvement Fund of the State of Florida and the State Board of Education of Florida, as Lessors, and Aerojet-General Corporation, as Lessee

Gentlemen:
 Aerojet-General Corporation has elected to exercise its option to purchase the lands which are the subject of the above lease.
 We are enclosing herewith a copy of this Notice of Exercise of Option to Purchase, the original of which has been forwarded to the State of Florida, Board of Trustees of the Internal Improvement Fund.
 We would appreciate your advice as to the procedure you wish to follow in the closing of this transaction.
 Very truly yours,
 AEROJET-GENERAL
 CORPORATION
 E. E. Nelson
 Plant Manager".

The letter to the Board of Trustees of the Internal Improvement Fund was identical except for the addressee and its being directed to the attention of Mr. James T. Williams, Chief State Land Office.

the "defendants have advised the plaintiff that they will not accept said required amount of the purchase price and will not execute, and have failed and refused to execute, said contract to purchase".

On December 1, 1969, the defendants filed their answer in the court below in which they admitted the allegations of the complaint[6] and interposed several affirmative defenses. The answer asserted that plaintiff had breached the contract by shutting down its operations in June, 1967, thereby rendering it ineligible to purchase the property under the terms of the option clause. Additionally, the defendants suggested that the remedy of specific performance was inappropriate because the value of the land involved had appreciated considerably between the time the lease was executed and the time that the plaintiff gave its notice of election to exercise the option to purchase. On September 21, 1970, the district court granted the plaintiff's motion for summary judgment and directed the defendants to execute and comply with a contract of sale of the real property once the plaintiff had made the prescribed payments.

On January 15, 1971, the defendants filed their appellate brief with this Court in which they urged the reversal of the grant of summary judgment in favor of the plaintiff on the following grounds: (1) the plaintiff was in default under the terms of the lease at the time it sought to exercise the option to purchase because of the plant shutdown, and was therefore disqualified from exercising the option; and (2) the district court should not have granted summary

judgment as to the remedy of specific performance because the appreciation in the value of the land raised a material issue of fact which necessitated a trial on the merits. In response, the plaintiff argued that the lease clearly empowered the lessee to exercise its option at any time within the lease period and that the defendants, prior to their refusal to convey the land, had at no time given the required sixty day notice of default to the plaintiff. Aerojet of course took the position that the district court's grant of summary judgment was proper.

The State of Florida underwent a change of administration on January 5, 1971. The successor defendants, after a review of the record in this case, petitioned this Court for leave to file a supplemental brief. Leave was granted and oral argument postponed. On April 14, 1971, the defendants filed a supplemental brief in which they repudiated two concessions which their predecessors had made in the course of the proceedings in the district court: (1) that the defendants had authority under the laws of the State of Florida to grant to the plaintiff a ten-year option to purchase over twenty-five thousand acres of land at fifty dollars an acre; and (2) that the notice published in the Homestead News was sufficient to comply with the requirements of applicable Florida law.[7] In reply to the supplemental brief of the defendants, Aerojet filed a brief in which it argued that: (1) the law of Florida empowered the defendants to dispose of the lands held by them by means of lease, sale, or option; (2) the notice published in the Homestead News complied with all the pertinent provisions of

6. The answer to the complaint as well as to Requests for Admissions asserted that defendants were without knowledge of the allegations of plaintiff's being an Ohio corporation with its principal place of business in a state other than Florida. This was covered by affidavit in connection with the Motion for Summary Judgment and is not in dispute.

7. The district court noted:
"It is conceded by the defendants that the Trustees and the Board of Educa-

tion have complete authority and discretion to convey and dispose of lands held by them in such manner as in their judgment may be most advantageous. * * * Defendants have likewise conceded that the notice provisions contained in Chapter 270, Florida Statutes, F.S.A., were followed; and there is no bar to plaintiff's claim arising out of the requirements of those statutes." 318 F.Supp. at 61.

the Florida statutes; and (3) the defendants were estopped to deny the validity of the option clause in the lease.

At oral argument, this Court, on its own motion, raised the question of whether this suit was barred by the provisions of the Eleventh Amendment to the United States Constitution.[8] In response to the Court's request, the parties submitted additional briefs on this point, Aerojet arguing that the suit is not barred by the Eleventh Amendment and the defendants taking the contrary position.

## I.

### Waiver of Eleventh Amendment Immunity by General Appearance

Even if this suit was initially barred by Eleventh Amendment immunity, such immunity may have been waived by general appearance and defense on the merits in the trial court. We approach the waiver question first.

In Clark v. Barnard, 1883, 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780, the assignees of a bankrupt railroad and the treasurer of the State of Rhode Island contested ownership of a $100,000 certificate of indebtedness issued by the City of Boston. The assignees brought suit in federal court and named the State Treasurer, Samuel Clark, as a defendant. Clark demurred to the complaint on the basis that the Eleventh Amendment to the United States Constitution barred the suit. The demurrer was overruled. An interlocutory decree was subsequently entered ordering the City of Boston to pay into the registry of the court the face amount of the certificate and authorizing the State of Rhode Island to file a claim for damages for breach of a surety bond given by the officers of the railroad prior to its bankruptcy. The money was paid in and the State filed its claim. After judgment was entered for the assignees, Clark and the State

appealed, raising the jurisdictional bar of the Eleventh Amendment. The Supreme Court rejected this argument saying:

"We are relieved, however, from its consideration by the voluntary appearance of the state in intervening as a claimant of the fund in court. The immunity from suit belonging to a state, which is respected and protected by the constitution within the limits of the judicial power of the United States, is a personal privilege which it may waive at pleasure; so that in a suit, otherwise well brought, in which a state had sufficient interest to entitle it to become a party defendant, its appearance in a court of the United States would be a voluntary submission to its jurisdiction, while, of course, those courts are always open to it as a suitor in controversies between it and citizens of other states. In the present case the state of Rhode Island appeared in the cause and presented and prosecuted a claim to the fund in controversy, and thereby made itself a party to the litigation to the full extent required for its complete determination. It became an actor as well as defendant, as by its intervention the proceeding became one in the nature of an interpleader, in which it became necessary to adjudicate the adverse rights of the state and the appellees to the fund, to which both claimed title. The case differs from that of Georgia v. Jesup, 106 U. S. [458], 462 [1 S.Ct. 363, 27 L.Ed. 216], where the state expressly declined to become a party to the suit, and appeared only to protest against the exercise of jurisdiction by the court. The circumstance that the appearance of the state was entered without prejudice to the demurrer of Clark, the general treasurer, does not affect the result. For that demurrer could not reach beyond the question of

---

8. "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

the right to sue Clark by reason of his official character, which became insignificant when the state made itself a party; and in point of fact the bill was framed to avoid the objection, by charging Clark as a wrong-doer in his individual capacity." 108 U.S. at 447–448, 2 S.Ct. at 883–884, 27 L.Ed. at 784–785.

Were this the Supreme Court's final statement on the subject of the waiver of a state's Eleventh Amendment immunity by means of a general appearance in federal court, we would have no difficulty in finding such a waiver in this case. The waiver by general appearance doctrine was severely undermined, if not discarded, however, as a result of the Supreme Court's decision in Ford Motor Company v. Department of Treasury of the State of Indiana, 1945, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389.

The Ford Motor Company brought suit in federal court against the department of the treasury of the State of Indiana and the board of that department, consisting of the governor, treasurer and auditor, pursuant to Section 64–2614(a) of the Indiana statutes, seeking a refund of gross receipts taxes. The Indiana officials defended on the merits of the taxpayer's claim and were successful in the district court and in the court of appeals. The Supreme Court vacated the judgments of the lower courts and remanded the case with instructions to dismiss the complaint for want of the consent of the State of Indiana to suit. Without referring to its holding in Clark v. Barnard, supra, the Supreme Court disposed of the taxpayer's waiver of immunity by general appearance contention as follows:

"It remains to be considered whether the attorney general for the State of Indiana in his conduct of the present proceeding has waived the state's immunity from suit. The state attorney general is authorized to represent the state in actions brought under the Indiana refund statute. He appeared in the federal District Court and the Circuit Court of Appeals and defended the suit on the merits. The objection to petitioner's suit as a violation of the Eleventh Amendment was first made and argued by Indiana in this Court. This was in time, however. The Eleventh Amendment declares a policy and sets forth an explicit limitation on federal judicial power of such compelling force that this Court will consider the issue arising under this Amendment in this case even though urged for the first time in this Court." 323 U.S. at 466–467, 65 S.Ct. at 351–352, 89 L.Ed. at 395–396.

■ Following the holding in *Ford Motor Company*, we are of the opinion that the defendants did not waive the right to claim immunity from suit under the Eleventh Amendment to the Constitution by defending on the merits in the district court.[9]

## II.

### The Existence of Eleventh Amendment Immunity

■■ Mr. Justice Reed, speaking for the Court in *Ford Motor Company*, supra, laid down a two-step test for the existence of an Eleventh Amendment immunity from suit in federal court: (1) whether the action is against the state, and (2) if the action is against the state, whether the state consented to be sued in the federal courts. 323 U.S. at 462, 65 S.Ct. at 349, 89 L.Ed. at 393. The Court indicated that, in answering the first inquiry, a federal court was to look to the law of the appropriate state for guidance. 323 U.S. at 463, 65 S.Ct.

9. In so ruling, we are not unmindful of the citation of Clark v. Barnard in Mr. Justice Douglas's opinion for the Court in Petty v. .Tennessee-Missouri Bridge Commission, 1959, 359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804, 807, for the proposition that immunity can be waived by general appearance. See, also, MacDonald v. Board of Regents of the University of Michigan, 6 Cir. 1967, 371 F.2d 818.

at 350, 89 L.Ed. at 394. Our analysis of Florida law leads us to the conclusion that the first question should be answered in the negative. In view of this ruling, we do not reach the second step of the test.

Section 229.012, Florida Statutes, F.S.A., provides that the state board of education shall consist of the governor, the secretary of state, the attorney general, the comptroller, the treasurer, the commissioner of agriculture, and the commissioner of education. Pursuant to Section 229.053(2) (f), Florida Statutes, F.S.A., the board of education is instructed "to have possession of and manage all lands granted to or held by the state for educational purposes". This board's powers over state educational land are further elaborated in Section 229.061(6), Florida Statutes, F.S.A.:

"It shall be the responsibility of the state board to exercise all powers and perform all duties prescribed below: To obtain possession of, to hold title to, and take general charge, oversight, and management of all lands granted to or held by the state for educational purposes; to fix the terms of sale and policies relating to rental or use of such lands, and to adopt whatever policies may be necessary to preserve them from trespass or injury and to provide for their improvement."

Pursuant to Section 253.01, Florida Statutes, F.S.A., certain lands and the proceeds of the sale of such lands are set apart and declared a separate and distinct fund, called the Internal Improvement Trust Fund of the State. Section 253.02(1), Florida Statutes, F.S.A., enumerates the powers of the Board of Trustees of the Fund:

"For the purpose of assuring the proper application of the internal improvement trust fund for the purposes of this chapter, the land provided for in §§ 253.01 and 253.03, and all the funds arising from the sale thereof, after paying the necessary expense of selection, management and sale, are irrevocably vested in a board of seven trustees, to wit: The governor, the secretary of state, the attorney general, the comptroller, the state treasurer, the commissioner of education, the commissioner of agriculture and their successors in office, to hold the same in trust for the uses and purposes provided in this chapter, with the power to sell and transfer said lands to the purchasers and receive payment for the same, and invest the surplus moneys arising therefrom, from time to time, in stocks of the United States, stocks of the several states, or the internal improvement bonds issued under the provisions of law; also, the surplus interest accruing from such investments. Said board of trustees have all the rights, powers, property, claims, remedies, actions, suits and things whatsoever belonging to them, or appertaining before and at the time of the enactment hereof, and they shall remain subject to and pay, fulfill, perform and discharge all debts, duties and obligations of their trust, existing at the time of the enactment hereof or provided in this chapter".

In Hampton v. State Board of Education, 1925, 90 Fla. 88, 105 So. 323, suit was brought against the State Board of Education and its members to compel specific performance of a contract to sell school lands. The trial court sustained the defendants' demurrer to the complaint on the basis that the suit was in actuality one against the state to which the state had not consented. On appeal, the Supreme Court of Florida affirmed.

At the time the contract to purchase in *Hampton* was executed, the Florida Statutes provided:

"The state board of education are directed and empowered:

"First. To obtain possession of and take charge, oversight and management of all lands granted to or held by the state for educational purposes, and to fix the terms of sale, rental or use of such lands, and to do whatever may be necessary to preserve them from trespass or injury, and for their improvement". Sections 601, 602, par. 1, Rev.Gen.Stats.1920.

In affirming the order of the lower court, the Florida Supreme Court declared:

> "The appellees are state officers and the subject-matter of the suit is state property. *The title to the property is not in the state officers. They merely have statutory authority to sell the property.*
>
> "This suit directly involves the property of the state. The state is the real party in interest, though the suit is nominally against state officers in their official capacity as state officials. . . . If the contract sued on is valid, it is the contract of the state". 90 Fla. at 97–98, 105 So. at 326. (Emphasis supplied)

We believe that Chapter 19355, Florida Laws, 1939, which amended what is now Section 229.061(6), Florida Statutes, F.S.A., remedied the defect which caused the Florida Supreme Court in *Hampton* to characterize that suit as one against the state. The statute as now written specifically *vests title to state school* lands in the State Board of Education.

As further support for our view, we refer to another portion of the *Hampton* opinion, in which the Court compared the powers of the State Board of Education with those of the trustees of the Internal Improvement Trust Fund:

> "By chapter 610, Laws of Florida, approved January 6, 1855 (sections 1055 et seq., Revised General Statutes 1920), superseding chapter 332, Laws of Florida, approved January 24, 1851, the 500,000 acres of internal improvement lands granted to the state by Act of Congress of March 3, 1845, and the swamp and overflowed lands received by the state under the Act of Congress of September 28, 1850 (U.S. Comp.St. §§ 4958–4960), were 'irrevocably vested in five trustees' who are state officers 'and their successors in office, to hold the same in trust for the uses and purposes' stated in the act, 'with the power to sell' the lands and with directions for executing the trusts for which the lands were 'irrevocably vested' in the trustees. Under such statutory provisions, suits against the trustee state officers, with reference to the execution of the trust including sales of the lands and the use of the proceeds for the trust, are not suits against the state. See Trustees I. I. Fund v. Bailey, 10 Fla. 112, text page 132, 81 Am.Dec. 194. In such cases the suits are to require the due performance of duties prescribed by statute.
>
> "By sections 602, 603, and 3798, Revised General Statutes 1920, the state retains the title to all state school lands and merely authorizes the state board of education to take possession of, to manage, to preserve, and to fix the terms of sale, and to convey the title to 'all lands granted to or held by the state for educational purposes.' Under these statutes the title remains in the state and the state officers have no title, but a mere power of agency to sell the lands, not for trust purposes of an administrative nature, but such sales are for 'the principal of the state school fund' which 'shall remain sacred and inviolate.' Sections 4 and 5, art. 12, Constitution. In view of these organic and statutory provisions, a suit brought against the state officers to enforce a contract for the sale of state school land is in effect a suit against the state, since it relates to land the title to which is in the state for the benefit of a 'sacred and inviolate' school fund, and the state has not by statute directed the contract to be made, and has not by law authorized a suit against the state." 90 Fla. at 100–101, 105 So. at 327.

As noted above, Section 229.061(6), Florida Statutes, F.S.A., presently vests title to Board of Education land in the Board and not the State of Florida.

▇ We hold that this suit does not constitute an action against the State of Florida and is, therefore, not barred by the Eleventh Amendment to the United States Constitution, as to either of the two state boards in question.

## III.

### Discharge by Failure of Consideration

█ In the district court and here, the defendants have argued that the plaintiff, by discontinuing solid fuel development operations at its Dade County facilities, in June, 1967, disqualified itself from exercising its option to purchase the land pursuant to the option clause of the lease. In other words, the cessation of development activities, according to the defendants, constituted "failure of consideration". Our analysis of the lease leads us to reject the "failure of consideration" theory advanced by the defendants.

Professor Corbin, in his treatise on the law of Contracts, has this to say about the doctrine of failure of consideration:

"In the case of a promise that is not entirely independent, the promisor may be discharged by his failure to receive the agreed equivalent for which his promised performance was to be exchanged. This is true, even though the other party has not promised in return to perform this agreed equivalent. The promisor's duty to render his performance may be either expressly or impliedly conditional upon the giving of something recognized by the parties as the agreed equivalent of that which he himself promises to do, even though there is no promise by anybody in return. In such a case, if the promisor has not received and is not going to receive the agreed equivalent of his own performance, he will not be required to perform at all. There is a failure of consideration, even though there is no breach of contract. In most cases, doubtless when the parties have agreed upon an equivalent to be exchanged for a promised performance, the contract is put into a bilateral form, with a return promise to render the agreed equivalent. In such a case failure of consideration may also be a breach of contract; and the discharge could be called a discharge by breach, as well as a discharge by failure of consideration. The failure to render a promised performance may not be a breach of contract for the reason that performance has become impossible without fault; but it is nonetheless a failure of consideration discharging the other party from his duty to make the agreed return and giving him a right to the restitution of payments already made or other benefits already conferred". Corbin on Contracts, Section 1255, Volume 6, page 21.

Under the terms of the lease, the plaintiff agreed to pay an annual rental in amount equal to $2.50 per acre, to pay to local taxing authorities amounts equal to the ad valorem taxes which would ordinarily be assessed against the property, and to grant necessary easements and rights of way to the South Florida Flood Control District. The promise which constitutes a critical aspect of this case reads as follows:

"3. The lessee herewith agrees and covenants to commence within twelve (12) months after the execution hereof, the construction and installation of a manufacturing plant and associated facilities on said land or upon lands contiguous thereto owned, leased or controlled by lessee and in so doing to utilize the aforementioned described land in conjunction with the operation of such manufacturing plant and associated facilities".

This paragraph was amended by the parties on January 14, 1963, to permit the plaintiff to commence construction of the plant no later than December 21, 1964.

The plaintiff did construct the manufacturing facilities as contemplated by the lease. When the federal government reduced its spending on solid rocket fuels, however, the plaintiff terminated its operations at the Dade County location. Once the plaintiff completed construction of the agreed-upon facilities, the defendants received all they had bargained for. The lease did not expressly or impliedly require the plaintiff to engage in solid rocket fuel development op-

erations throughout the life of the lease as a prerequisite to the plaintiff's exercise of its option to purchase. Even if the lease and option to purchase are to be treated as inseparable aspects of one transaction, we are of the opinion that the defendants may not avoid performance on a failure of consideration theory.

Our resolution of the failure of consideration issue is buttressed by the fact that the defendants at no time prior to the attempted exercise of the option to purchase in September, 1969, gave the plaintiff the required sixty-day cure notice stipulated by the fourth paragraph of the lease. Between the time that the plaintiff curtailed its operations in June, 1967, and the time that the plaintiff attempted to exercise its option to purchase, the defendants had ample opportunity to determine that a breach had taken place and to dispatch the sixty-day cure notice. Accordingly, we concur with the district court in holding that no failure of consideration took place in June, 1967.

## IV.

## The Grant of Specific Performance on Summary Judgment

■ The defendants urge that it was an abuse of discretion for the district court to grant the equitable relief of *specific performance without holding an* evidentiary hearing. In this regard, the defendants allude to the fact that the value of the land in question probably increased in value between 1961 and 1969, thereby raising the issue of inadequacy of consideration. Our examination of the matters presented to the district court by the defendants in opposition to the plaintiff's motion for summary judgment leads us to conclude that the court below committed no abuse of discretion in summarily granting specific performance to the plaintiff.

We note as a preliminary that specific performance may be granted on a motion for summary judgment in appropriate cases. Professor Moore observes:

"The basic principles governing the grant or denial of summary judgment in other types of actions apply, of course, in actions for the reformation or rescission of a contract; or for specific performance, for damages, or for specific performance or in the alternative for damages of all types of contracts". Moore's Federal Practice, Section 56.17(11), page 2507.

Professor Corbin's discussion of options contains the following passages:

"An option to buy or sell is frequently given as part of a larger contract with other purposes; and a consideration sufficient to make the option binding and irrevocable may be found in the consideration that the optionee gives in that larger contract. Thus, suppose a lease of land in which the lessee is given an option to buy at a stated price conditional on notice before termination of the lease. The promise to pay rent is the consideration both for the lessor's covenants as lessor and for his promise to sell; it is sufficient to make all the promises enforceable that are given in return for it, and the option is not revocable". Corbin on Contracts, Section 266, Volume 1A, pages 539–540.

"It has been thought that equity would not decree the specific performance of an option contract for any one of several reasons. These reasons are not sound and the remedy is available in spite of them; but they require some discussion. These reasons are absence of consideration, inadequacy of consideration, and lack of mutuality because the holder of the option is not bound to perform."

"First, suppose that A promises under seal to sell Blackacre to B for $5,000, if B gives notice of acceptance within 30 days. Secondly, suppose that the foregoing promise of A is in consideration of one dollar actually paid. These cases may be discussed together. In the first case, there is no consideration for A's promise, and in the second the consideration is a small

amount. The courts of equity did not require adequacy of consideration, as measured by the general market, as a prerequisite to specific enforcement; but they frequently did say that specific enforcement would be denied if the consideration was so grossly inadequate as to shock the chancellor's conscience and lead to the conclusion that there had been fraud or unfair dealing. Accepting this doctrine at its face value, it does not prevent specific enforcement of either of the option contracts supposed above. The purpose of the doctrine is to prevent fraud and unfair dealing and to prevent one person from acquiring the property of another for nothing or for a shockingly inadequate return. In the present cases, there is no unfair dealing and the option contract does not purport to require A to convey Blackacre for nothing or for one dollar. The agreed price is $5,000; and unless that is shown to be shockingly inadequate, the chancellor's conscience will be quite at ease. The decree compelling A to convey will be made conditional on B's payment of $5,000 into court; or, if the option agreement provided for deferred payment, conditional upon giving sufficient security". Corbin on Contracts, Section 269, Volume 1A, pages 557–558.

In discussing contracts for the sale of land, Professor Corbin states:

"The purchaser's remedy in damages for breach of contract to transfer land or an interest therein is practically never regarded as so complete and adequate as to preclude specific enforcement". Corbin on Contracts, Section 1143, Volume 5A, page 126.

The Florida jurisprudence is in harmony with the above-quoted excerpts from the Corbin treatise. In Charbonier v. Arbona, 1912, 63 Fla. 384, 57 So. 887, the Supreme Court of Florida held that equity will specifically enforce a contract for the sale of land when the price is a fair one when the contract was made and no advantage has been taken of the defendant. In *Charbonier*, the defend-

ant, in March, 1910, for a consideration of $100 in cash, gave the plaintiff an option to buy the defendant's land for $5,000 within six months. The option was exercised before the end of the six month period and specific performance was decreed even though the value of the property had substantially increased.

In Bigman v. University Federal Savings and Loan Association, 1965, Fla. App.3rd, 170 So.2d 330, 331, the Court noted:

"The optionee [for consideration] during the term of his option has a right that the option giver shall not repudiate nor make performance impossible or more difficult, and said right is enforceable by all the usual judicial remedies including judgment for damages, injunction and decree for specific performance."

Paragraph 8 of the lease gave the plaintiff the option to purchase all the land described in the instrument "at any time within the ten (10) year lease period at and for a price of Fifty Dollars ($50.00) per acre". The defendants presented to the district court no reason to characterize the option purchase price as unreasonable or inequitable at the time the lease was executed. We find no reason to suppose that the defendants' predecessors were so inexperienced or uninformed in 1961 that the present defendants should be insulated from a decree of specific performance.

V.

Defendants' Authority to Grant the Option

 On this appeal, the defendants argue that their predecessors in office were without power in 1961 to grant the plaintiff an option to purchase exercisable within the ten year term of the lease. The thrust of this argument is that the pertinent Florida statutes do not specifically empower the State Board of Education or the Board of Trustees of the Internal Improvement Trust Fund to include an option to purchase real property within a lease. De-

fendants in this connection cite no Florida decisions but refer us to rulings of courts in Texas, Georgia, and Mississippi.[10]

Plaintiff, in contending that the predecessors of the defendants had sufficient authority in 1961 to grant an option to purchase within the ten year lease period, points to the absence of Florida decisions on this point and to the long established practice on the part of the State Board of Education and the Internal Improvement Trust Fund of including renewal options in leases. It also urges that the statutory powers granted the State Board of Education and the Internal Improvement Trust Fund are sufficiently broad to encompass the power to grant an option to purchase within a lease instrument, as well as to sell.

Defendants' argument on this point is not persuasive. As officials of the State of Florida, the defendants are of course limited to activities that are within their statutory authority, but we believe that the predecessors of the defendants did not, in 1961, exceed their warrants by executing the lease which serves as the basis for this lawsuit.

We recognize the obligation of the defendants to safeguard an asset of the State of Florida—land—which is in increasingly short supply. The defendants nevertheless clearly have a duty to deal fairly with those with whom they have contracted. As a matter both of statutory construction and of good faith and fair dealing, we conclude that the defendants should not prevail on the issue of authority to grant an option to purchase the land covered by the lease.

## VI.

### The Sufficiency of the Notice

The defendants argue on this appeal that the notice published in the Homestead News in September and October, 1961, did not conform to the Florida competitive bidding statutes, Sections 270.07, 270.08 and 270.09, Florida Statutes, F.S.A.,[11] in that the portions deal-

---

10. Potter County v. C. C. Slaughter Cattle Co., 1923, Tex.Civ.App., 254 S.W. 775; Adler v. Adler, 1961, 216 Ga. 553, 118 S.E.2d 456; American Oil Company v. Marion County, Miss.1939, 187 Miss. 148, 192 So. 296.

11. "270.07 Certain public lands not to be sold without advertisement

No lands in the state that are now, or may hereafter be, vested in the board of trustees of the internal improvement trust fund of the state, or the state board of education, shall be sold, conveyed or disposed of by the said board of trustees or by the said board of education until notice by publication shall have been given for the full term of thirty (30) days prior to such sale; provided, that this section shall not apply to homestead, railroad or canal grants, as now provided for by law nor to any conveyance pursuant to the provisions of § 253.111.

"270.08 Notice of sale of public lands by advertisement

When the board of trustees of the internal improvement trust fund, or the state board of education shall decide or regard it expedient to sell any of the lands that are now, or may hereafter be, vested in the board of trustees of the internal improvement trust fund of the state, or in the state board of education, they shall give thirty (30) days' notice of such sale, by publication in some newspaper published in the county or counties where such lands to be sold are situated, and also, such other papers as may be deemed advisable, once each week; which said notice shall contain a description of the lands, state the terms of sale, the time and place where such lands shall be sold, and notify the people that they will receive bids therefor at Tallahassee, from the time of giving such notice until the day of sale. In case said board of trustees is making the sale, they shall require the persons publishing said notice to file with it immediately after the expiration of the time of such sale, proof of said publication, which shall, at all times, be subject to inspection by any person desiring to see same. And in case the said state board of education is proceeding to make such sale, it shall likewise require such persons publishing said notice to file with it, immediately after the expiration of the time of said sale, proof of said publication, which shall at all times be subject to inspec-

ing with the construction of manufacturing facilities were fatally indefinite. In arguing that these portions rendered it impossible for the appropriate public officials to make exact comparisons of the bids, defendants-appellants assert in their brief:

"In order for the bidders to be on a parity and in order for comparisons to be made as to which bid would be the highest and best and in order for the bidder to understand the nature and character of the obligation he is required to assume, it was essential and necessary that the notice contain a complete and detailed description of the proposed manufacturing plant and associated facilities to be installed and constructed. No one could possibly ascertain from this notice the size, cost, or purpose of 'a manufacturing plant and associated facilities' from anything that was contained in said notice. It was within the power of the trustees to include a covenant, if one bidder was successful, which might require a manufacturing plant and associated facilities costing hundreds of millions of dollars, but, if another and favored bidder was the highest, the board could insert a covenant requiring the installation and construction of a manufacturing plant and associated facilities costing only a few thousand dollars. Nothing could be plainer than that this was a notice for bids aimed to assure Aerojet it would get the property. This flies directly in the teeth of the competitive bidding statute and renders the option to purchase invalid and unenforceable." (Appellants' supplemental brief, page 23)

We regard it as significant that, despite appellants' intimation that the claimed ambiguity of the notice for bids was designed to assure the plaintiff that it would get the property, they fail to allege any fraud, favoritism, collusion, or corruption between Aerojet and the defendants' predecessors in office. In the absence of such allegations, Florida jurisprudence will not permit the defendants to escape performance because of the claimed inadequacy of the notice for bids.

In the leading case of Wester v. Belote, 1931, 103 Fla. 976, 138 So. 721, the Florida Supreme Court refused to enjoin Duval County from paying a vendor of

tion by any person desiring to see same. None of the provisions of this section shall limit the applicability of § 253.111. "270.09 Bids to purchase public lands; sale to highest bidder; proviso, etc.

After the notice referred to in § 270.07 shall have been issued, any person shall have the privilege of filing with the trustees of the internal improvement trust fund, if they be making the sale, or with the state board of education, if it be making the sale, a bid or written proposition to purchase said lands; and same shall not be opened until the day of sale provided in said notice, at which time all bids shall be opened in the presence of the said trustees, if they be making the sale, or in the presence of the state board of education, if it be making the sale, at the office of the said trustees or the board of education making the sale, as the case may be, in Tallahassee, at which time any person so desiring may be present. And the said trustees, if they be making

the sale, or the said state board of education, if it be making the sale, shall sell to the highest bidder, upon satisfactory terms, for cash or otherwise, as they may determine, the lands advertised as prescribed in § 270.07, and shall make, execute and deliver a deed or deeds to the purchaser or purchasers of such lands, in the manner now provided by law and in accordance with the terms agreed upon.

A record of all such sales and proceedings shall be kept by the said trustees, if they be making the sale, or by the said state board of education, if it be making the sale, which shall at all times be subject to inspection by any and all persons; provided, that all bids may be rejected if the price offered is not satisfactory to those making the sale; and provided further, that §§ 270.06–270.08 and this section shall not apply where the quantity of land sought to be sold does not exceed a half section of land."

merchandise. In so doing, the Court rejected the contention of the taxpayer-plaintiff that the invitation for bids was defective in that it was not reasonably definite. After stating that contracts awarded in a manner which did not comply with the competitive bidding statutes were to be considered null and void, the Court cautioned:

"But it by no means follows that a competitively awarded contract must in every instance be set aside, and payments under it enjoined, at the suit of a citizen and taxpayer, because of insufficient specifications embraced in the advertisement for bids, where what has been done by the board appears to have been done as a result of a bona fide effort on the county commissioners' part to comply with the statute, *and no actual fraud, misconduct, favoritism, prejudice, or discrimination is charged with reference to the transaction as completed.*" 103 Fla. at 987–988, 138 So. at 726. (Emphasis supplied)

Although the *Wester* case involved the complaint of a taxpayer against the payment by a county board to a vendor under a public advertisement to bid whereas we deal here with the refusal of successor trustees to convey real property to Aerojet, a successful bidder for that right, we nevertheless find the above quoted excerpt from the *Wester* opinion of compelling application to this case. At this late date, after the plaintiff has in good faith made the required payments and dispatched the required notices of election necessary to exercise its option to purchase, we hold that Aerojet is entitled to prevail in the absence of specific charges of "actual fraud, misconduct, favoritism, prejudice, or discrimination". *Wester*, supra.

For the reasons we have outlined, the judgment and decree of the district court are

Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.