### THE TRUSTEES OF THE INTERNAL IMPROVEMENT FUND, APPELLANTS, vs. WILLIAM BAILEY, APPELLEE.

A holder of Bonds, issued under the Internal Improvement Act of January 6, 1855, may enjoin the Trustees of said Fund from appropriating any portion of it to other purposes than those named in the Act, so as to endanger his security, even though such appropriation be commanded by a subsequent Act of the General Assembly.

Appeal from Leon Circuit Court.

By an act of the Congress of the United States, March, 1845, certain lands were granted to the State of Florida to be applied to objects of Internal improvement within the State, to wit : roads, railways, bridges, canals, improvement of water courses and draining of swamps. In September, 1850, Congress passed another act known as the Swamp Land Act, granting all swamp and overflowed lands within the same to the State, providing that the proceeds of the same, as far as necessary, should be applied to the purpose of reclaiming said swamp lands by means of levees and drains.

The Legislature of the State of Florida, January 6, 1855, passed an act to provide for and encourage a liberal system of Internal Improvements in this State, the first section of which provides, "That so much of the five hundred thousand acres of land granted to the State for Internal Improvement purposes, by an act of Congress passed the third day of March, A. D. 1845, as remains unsold, and the proceeds of the sales of such of said lands heretofore sold as now remain on hand and unappropriated,. and all proceeds that may hereafter accrue from the sales of said lands ; also all the swamp land or lands subject to overflow, granted to the State by an act of Congress, approved September 28, A. D. 1850, together with all the proceeds that have accrued or may hereafter accrue to the State from the sale of said lands, are

hereby set apart and declared a distinct and separate fund, to be called the Internal Improvement Fund of the State of Florida, and are to be strictly applied according to the provisions of this act."

This act of the Legislature known as the Internal Improvement Act, then proceeds to vest said lands and the funds arising from the sale thereof, irrevocably in five trustees, to wit: the Governor of the State, the Comptroller of Public Accounts, the State Treasurer, the Attorney General and the Register of State Lands and their successors, to be held in trust for the uses and purposes provided in the act. Among the uses and purposes provided in the act to which the fund is to be applied, the main one is the payment of interest on bonds which certain R. R. Companies, accepting the provisions of the act or lines of R. Road, are authorized to issue.

The Pensacola & Georgia R. Road Co., a company chartered in 1851, having accepted the provisions of the Internal Improvement Act, issued certain bonds, previous to the year 1861, according to the same, the interest on which bonds was guaranteed by the trustees of the Internal Improvement Fund according to the law. These bonds were purchased by the complainant Bailey, and were held by him at the time of the institution of this suit.

On the 14th January, 1861, the Legislature passed "an act to improve the navigation of the Apalachicola river, and to reclaim the swamp and overflowed lands on said stream," by which it was enacted, "that the trustees of the Internal Imp. Fund shall contract for the clearing out and improving of the channel of the Apalachicola river, and to reclaim the swamp and overflowed lands on said stream, and shall have said work done as soon as practicable, and shall raise whatever means are necessary from the Internal Improvement Fund and from the lands thereof."

The trustees of the Internal Improvement Fund on the 18th day of February, A. D. 1861, in pursuance of the above act, adopted the following Resolution :

"*Resolved*, That in accordance with the act entitled an act to improve the navigation of the Apalachicola river and to reclaim the swamp and overflowed lands on said stream, the Mayor and Council of the City of Apalachicola are hereby authorized to have a survey made of the Apalachicola river from the point known as the outer stake on said river, up the river to the corporate limits running up in front of the city wharf, for the purpose of cleaning out and improving the channel of said river, and that said Mayor and Council report to this Board the cost of said work and the practicability of the same, and the depth of water required and the amount necessary to accomplish the same."

On the 9th day of March, 1861, the complainant filed his bill praying for an injunction to restrain the trustees of the Internal Improvement Fund from applying said fund or any part thereof, to the cleaning out of the Apalachicola river, or making any survey preparatory thereto, and from applying said fund to any other purpose, except those provided for in the Internal Improvement Act.

To this bill the defendants filed their answer, June 22, 1861, setting forth the acts of Congress and of the Legislature relative to the subject, the adoption of the resolution as above stated in pursuance of the direction of the Legislature, and submitting the matter to the Court to ascertain the law and to direct their attention relative thereto.

*Baltzell* for appellants.

The Internal Improvement law of 1855 designates three objects to which the fund shall be applied through three separate and distinct clauses.

1. After the grading, &c., of twenty miles, the Rail Road

Companies, (accepting the law,) "are authorized to issue coupon bonds at the rate of $8,000 a mile for the purchase and delivery of the iron rail, spikes, plates and chairs, and after the rail is laid down the additional sum of $2,000 per mile for the purchase of the necessary equipments." Sec. 8, p. 13. On these bonds the trustees are to endorse " a certificate that the Internal Improvement Fund *is pledged to pay the interest as it may become due on said bonds.*" Sec. 3, p. 10.

2. " The trustees shall make such arrangements for the *drainage of the swamp and overflowed lands as in their judgment may be most advantageous to the fund* and the settlement and cultivation of the land." Sec. 16, p. 11.

3. " The Board are authorized to pay out, as the work progresses, the whole amount agreed upon by the terms of the contract for connecting the waters of the St. Johns and Indian rivers, provided the cost shall not exceed $4,000 per mile, and provided the trustees shall be of opinion that this can be applied without impairing the efficiency of the fund for rail road purposes." Sec. 17.

There is no grant here to one object but to three, and by every principle of right reason they are all entitled, if there be a sufficiency, to an equal distribution, neither superior, and no discrimination in favor of one over the other. If there be a deficiency, there is a provision for abatement in case of the improvement of the St. Johns river ; there is none in the other cases, so that rail roads and drainage are entitled to full shares each, in every event and under all circumstances.

There are other provisions of State legislation for drainage, as well of prior as of subsequent date.

In 1851, a classification of the swamp and overflowed lands was ordered, and the Treasurer was directed to keep an account of the sales of the said lands separate and dis-

tinct from others, " and a right of pre-emption was granted in them," Sec. 1, 2, 4, 6, p. 93.

In 1853, " contracts were directed to be made with persons to reclaim swamp lands for a portion not exceeding one half." Sec. 2, p. 76.

In 1861, the trustees were ordered " to contract for improvement of the Apalachicola, Chipola and other rivers, and to reclaim the swamp and overflowed lands thereon."

The law of 1855 specially recites the provision of the State constitution as to the appropriation of the public domain and internal improvements, and the two laws of Congress from which the fund in controversy is derived, so that these also are necessary and indispensable to an intelligent understanding of the questions at issue.

The constitution designates " *roads, canals and navigable streams* " as the objects of internal improvement, and directs the public domain or its proceeds to be applied to them. Art. 11, sec. 1, 2.

In 1841, Congress made a donation of 500,000 acres of land with a special provision " that the net proceeds thereof shall *be faithfully applied* to objects of internal improvement, to wit: *roads, railways, bridges, canals, improvement of water courses and draining of swamps.*"

Another donation upon which the entire case depends, as it is understood the 500,000 acre grant has been exhausted, was made in 1850, in the following terms :

" To enable the State of Arkansas and other States to construct necessary levees and drains to reclaim the swamp and overflowed lands within their limits," it is enacted that the whole of said lands unsold at the passage of this act, be granted to the States subject to the disposal of the Legislature thereof: *Provided, that the proceeds of said lands, whether from sales or by direct appropriation, shall be applied exclusively, as far as may be necessary, to the purpose*

*of reclaiming said lands by means of levees and draining.*"

By another clause the provisions of this law were extended to other States having swamp lands.

Other acts of Congress making donations of land, with provisions for specified objects, are to be found on our statute book—thus, " eight sections for a seat of Government," " a section to the inhabitants of every township for common schools," " two townships for two seminaries of learning," " one section to each county site," " a township to the Kentucky Asylum for the deaf and dumb," " five per cent. of the net proceeds of public land for the purposes of education," " every alternate section for six sections in width on each side of said roads, to rail roads ; " the State in this manner has made grants to them, the grants to the rail roads claiming an interest in these funds amounting alone to two millions of acres.

These were all made in the sacred trust and confidence that the proceeds of the lands so given should be devoted in good faith to the purpose designated, and it is readily perceived that a departure in the one case is as allowable as the other. If the fund may be given in the present controversy to railroads, then every donation above cited may in like manner be transferred by legislative act, and their very grant of two millions, may be applied to other objects.

With these provisions so full, express and direct, the two laws of Congress (from which the entire fund is derived,) one ordering its application " to water courses, draining of swamps," &c., the other " exclusively to drainage ; " the Constitution " to navigable streams, canals and roads," the law of the Legislature of 1855 to drainage, canals, and railways, and other laws applying it " to drainage and navigable streams." Is there any one to contend that drainage and navigable streams were not designed to be and are not provided for ; that they are not objects of improvement, and have

no claim whatever to the fund ; that it belongs entirely to railways, excluded from the principal donation—embraced in the other only in common with five other objects—not embraced by the paramount law—one only of three donees by the act of 1855, and not embraced by the other acts of the General Assembly ?

Where is the doctrine of law, the principle of equity or justice, of morals, right or propriety, to give to one what has been solemnly appropriated and is the rightful property of another, to make one the entire exclusive recipient, the sole beneficiary of a gift made to others associated with him ? Can one donee, legatee or heir of a joint devise or inheritance, as such assert rightful title to the entire estate ? Can the donee of an estate be thus thrust aside from his lawful right at the instance of a third party not embraced in the donation, or of others having but a right to an equal share with him ?

Complainant Bailey and every stockholder of the Pensacola & Georgia Rail Road Company is by his own act estopped from the assertion of such claim. The laws of Congress making these donations were procured and passed at their instance, and on their application through their members in the two houses of Coungress, who fully assented to the terms annexed. Their members in the State Legislature solemnly ratified this action by accepting the grant, selecting the land and ordering its disposition, thereby making a treaty and compact to which they and every citizen of the State were parties, as if a separate obligation had been made by each to that effect. Not only the State then, but every citizen is bound by solemn engagement to see that the terms of the donations are faithfully observed and complied with. Can complainant make an engagement for this fund to his private uses when his own solemn engagement of prior

date binds him to have it appropriated to other uses and to other parties?

Complainant urges that the public faith is pledged to him and that his contract is protected from violation as well by the Constitution of the State as that of the late United States, each alike declaring that "no law impairing the obligation of a contract shall ever be passed." The full force of this provision is admitted, but its entire inapplicability to complainant's case is denied, the trustees representing those interested in drainage and the improvement of water courses alone being entitled to the benefit of this wise provision. The contract of the General Government with the State and its citizens is embraced by it and alike protected from invasion. It is prior in time to the engagement of complainant. If the State is bound by solemn compact and treaty to apply this land and this fund to drainage and water courses, how can it contract with complainant to apply it to his private uses? Can she break her engagement with them to make a valid contract with him? If the first contract be valid and binding, there is no power to break, and it maintains its efficacy in spite of any legislative attempt to impair its obligation.

Can there be faith, honor, or honesty in giving to him, to complainant what is rightly theirs? With the faith of the State impaired, violated and broken as to them, what is there remaining to give to him? That faith once broken is gone, ceases to exist. More than all, complainant's faith is concerned in seeing that this first contract of the State, its faith be maintained in the proper application of the funds to drainage, and especially that he and those under whom he claims shall not obtain it for themselves.

Complainant't claim is obnoxious to another provision of the State Constitution: "the General Assembly shall not

*pledge the faith and credit of the State in aid of any corporation whatever."* Art. 13, sec. 13.

The complainant claims to be owner of bonds in these terms: "The Pensacola & Georgia Railroad Company acknowledges itself indebted to ——— or bearer, in the sum of one thousand dollars, which they agree to pay on the first day of January, 1880, in the city of New York, with interest thereon at the rate of seven per cent., payable semi-annually on the first day of January and July of each year," signed by the President under the corporate seal. Attached is the following endorsement by the State : "Issued in accordance with the provisions of the act of the Legislature passed 6th January, 1851, creating the Internal Improvement Fund, *which fund is specially pledged for the payment of the interest on these bonds."* Tallahassee, Oct., 1851.

Great seal of the State.

> M. S. PERRY, Gov.,
> T. W. BREVARD, Compt.,
> C. H. AUSTIN, Treas.,
> M. D. PAPY, Att'y Gen.,
> DAVID S. WALKER, Reg'r,

Trustees of the Internal Improvement Fund.

These he bought. Would he have given his money to this company for these bonds without this endorsement of the State, without the pledge of this fund? Argument surely cannot be required to show that the faith and credit of the State have been given through this pledge and this endorsement. Complainant can only relieve himself from the dilemma by showing that the State has not by such action aided the corporation. In doing so he subverts and overturns the very foundation of his bill, and shows its main allegations to be false and untrue. This alleges that " *the inviolability of contracts and the plighted faith of the State*

*demand that said fund shall be applied to the payment of the interest on said bonds as the same became due."*

The endorsement of these bonds, in case of payment by the State, creates a debt, and in effect will be a loan of near ten millions of dollars to these corporations; nor will this alter the features of the case as presented, but add to its enormity and the injustice of the act. To create such a debt without security for repayment; to make a loan for a period of thirty years of a fund pledged to a special purpose, to a definite object; to place ten millions of public money at the hazard of entire loss as contended for, trusting to the wantonness and cupidity of irresponsible corporations and their good faith to restore it, shows a fatuity almost beyond the bounds of human belief.

Great concern is expressed for the fair fame and reputation of the State. It is urged that this cannot be maintained by disregard of a solemn compact, an abuse of a great public trust, a violation of the Constitution of the State and of the great principles of right and justice, held sacred and dear from the earliest period of the world's history. It is by the maintenance alone of compacts and trusts of the constitution and principle that the State can preserve its standing and fair character. The rejection of complainant's claim will protect us against all these; its allowance will place it in peril if not destroy it entirely.

It being established not only that the State has not devoted this entire fund to rail roads, but that in good faith she could not do so, the enquiry yet remains as to the action of the Board of Trustees appropriating a part of the fund, which gave rise to the filing of complainant's bill and the present controversy.

The General Assembly on the 14th February, 1861, made a law " that the trustees of the Internal Improvement Fund

*shall contract* for the clearing out and improving the character of the Apalachicola River, and *to reclaim the swamp and overflowed lands* on said stream," and "raise whatever funds are necessary from the Internal Improvement Fund and from the lands thereof."

In obedience thereto the Board passed a resolution "authorizing the Mayor and Aldermen of this city to have a survey made of the river in front thereof, and for the purpose of clearing out and improving the channel of the river, and that they report the cost of the work, its practicability, depth of water required and the amount necessary to accomplish the same."

This is the action complained of, and an injunction was granted to prevent any further appropriation of money to this object.

The Legislature, pursuing the mandates of the Constitution to carry into effect the two acts of Congress and the laws of the General Assembly of 1855, and others as aforesaid, designated the Apalachicola river and the swamp lands thereon as proper objects of improvement, and directed an application of a portion of the fund to them.

Argument surely is unnecessary to show that the improvement of the river is an appropriate means of drainage of the swamp lands on its banks. The trustees, by the law of 1855, are made the proper judges of this, "the arrangements for drainage being left to their judgment." Surely it is not competent for the Court to set up their judgment in the matter so as to overrule the decision of the Board. Are they engineers to determine in advance of enquiry whether a drain at the outlet of the river, on its banks or elsewhere, is or is not an appropriate means of drainage? This is to be determined by the trustees, and their action was by way of enquiry to determine the fact.

The sum proposed to be asked was from 20 to $50,000, a

very small portion of the fund derived from the donation of 500,000 acres, a very small part of the swamp land grant of twelve million of acres.

The bonds already issued to rail roads amount to $3,512,-800, and an application about being made for $250,000 more, making within a fraction four millions of dollars of bonds, the interest on which for thirty years will be $9,600,000. As already stated, they have received by direct grant two millions of acres of land. All this against not one cent applied to water courses, drainage, bridges, roads and other objects.

It is shown then, 1st, that complainant has no exclusive right to this land or to the fund claimed by him.

2d. That he has a right, but in common with others as joint donees, in the land granted by Congress of 500,000 acres.

3d. That the trustees, representing the interest of drainage and water courses, have the sole and exclusive right to the swamp land fund of 12,000,000 of acres, and an equal right in the other donation of 500,000 acres, a joint right under the Constitution and the law of 1855, and a right under other laws. In fine, it is submitted, if complainant has the better right, let it be shown. Ours is not only the older but the better, being derived from the original proprietor by gift, to which two governments and the citizens of the State were parties; his is of later date of 1855, derived from the very agent and trustee to whom the land and its proceeds were confided for our use. Ours is the prior claim, the first right and by every principle entitled to prior satisfaction.

Complainant may succeed, may gain and make money by the operation, the loss will be to the State and its people of that which is more dear to them than all, reputation, character, standing and their credit.

Principles of law and equity applicable to the case:

" It may be affirmed as a principle of equity, without exception, that whoever would seek admission into a Court of Equity must come with clean hands, and that such Court will never interfere in opposition to conscience and good faith." Creath vs. Sinase, 5 Pow., 204.

" An abuse of trust can confer no rights on the party abusing it, nor on those who claim in privity with him, and the party obtaining a fund, is regarded as trustee, and will be made to respond and answerable for all he has received." 2 Story's Eq., 504.

" The relief will be administered by considering the fund, in whatever person vested, bound by the trust." 1 Cruise's Dig., 482.

The State of North Carolina granted " land to the continental officers and soldiers in the service of the State," which was claimed adversely to the true owner. The Supreme Court of Tennessee held that " the trust became incorporated with the land and land warrants so as to affect all subsequent takers, and where a purchaser had notice of the trust he shall be subject to it." 1 Yerger, 309.

" Estoppels bind privies in blood, estate and in law. 1 Green. Ev., 26, assignee of a contract."—Ibid, p. 222.

" When propositions are offered by one State and agreed to and accepted by another, they constitute a compact between them." 1 Kent's Com., 393 ; 3 Story's Com., 254 ; 8 Wheaton, 1.

" Contracts and grants made by a State are not less within reach of the provision of the Constitution than contracts and grants of private persons. A compact between two States is within the scope of the provision."—Ibid.

*Woodward* on the same side.

*M. D. Papy* for appellee.

WALKER, J., delivered the opinion of the Court.

The complainant in the Circuit Court for Middle Florida asked by his bill filed in this case, that the Trustees of the Internal Improvement Fund be restrained from appropriating any portion of said Fund to the clearing out of the mouth of the Apalachicola river, claiming that such appropriation would be in derogation of his right as a large bond holder under the Act of January 6th, 1855, creating said fund, and providing for the existence of said Trustees.

The Trustees answer among other things that they are expressly commanded to make the appropriation complained of by an act of the General Assembly of February 14, 1861.

The cause was submitted on bill, answer and exhibits, and the Judge of the Middle Circuit having granted and perpetuated the injunction as prayed for, the case is brought before this Court by appeal.

The questions presented by the record for our consideration are: First, Did the General Assembly of 1855 have the power to pledge the Internal Improvement Fund as it did, to aid in the construction of certain roads, &c? Second, If they had the power to make such pledge, would any subsequent General Assembly have the power to divert any portion of said Fund to other purposes than those designated in the Act of 1855? Third, Is the appropriation sought to be enjoined by the Appellee in derogation of his rights as a bond holder under the Act of 1855? And Fourth, If so, has he a remedy by injunction against the Trustees?

It was argued at the bar that the General Assembly could not pledge the Internal Improvement Fund as it did in the Act of 1855, because the 11th Section of the 13th Article of the Constitution declares that the General Assembly shall not pledge the faith and credit of the State to raise funds in aid of any corporation whatever. But to our minds the dif-

ference between appropriating or pledging a fund already raised by the gift of the United States to the State of Florida, and the pledging of the faith and credit of the State to raise funds not yet in existence, is too manifest to admit of much argument. It is very clear that the General Assembly could not issue what are know as "faith bonds" in the banking history of this country, thereby pledging the faith and credit of the State to raise funds in aid of any corporation, but we think it equally clear that the General Assembly may convey in trust, pledge or mortgage, for the benefit of those who may aid in the construction of certain Internal · Improvements, a fund already existing and possessed by the State through the cession of the United States, and more firmly are we of this opinion when we read the second clause of the eleventh article of our State Constitution which declares thus : " A liberal system of Internal Improvements being essential to the development of the resources of the country, shall be encouraged by the Government of the State, and it shall be the duty of the General Assembly, as soon as practicable, to ascertain by law proper objects of improvements in relation to roads, canals and navigable streams, and to provide for a suitable application of such funds as may be appropriated for such improvements."

Nor is it a valid objection to the Act of 1855, that it does not designate one or more *rivers* for improvement as well as a canal and certain Railroads. It surely could not have been the expectation of the framers of the Constitution, that the General Assembly would be able at any one time to designate all the improvements that were through all time to be aided by this magnificent fund; on the contrary, the General Assembly were to do this "as soon as practicable," and as we think from time to time, as the means at · their command would justify it.

It is very evident that if the General Assembly had at one

time provided for the building of all the roads, the digging of all the canals, and the clearing out of all the navigable streams it would ever be desirable to build, dig and clear out, that the scheme would have been so gigantic, and the fund subjected to such a multitude of drains at the same time, as effectually to discourage capitalists from investing their funds in aid of any improvements whatever. But the General Assembly, as we think, took a wise view of the Constitution and therefore designated in the beginning, only a few grand objects, vital to the whole State, for improvement, leaving others to wait for their share of State aid, until those first inaugurated should have passed successfully through the fiery ordeal of their difficult and doubtful struggle into existence. Accordingly the General Assembly of 1855 designated for State aid, in the first instance, only a line of Railroad from Jacksonville to Pensacola, from Fernandina to Tampa Bay with a branch to Cedar Key, from Tallahassee to St. Marks, and a Canal between the Indian and St. Johns rivers. After these roads should be built and prove a success, by being able for five consecutive years to pay six per cent. on the capital stock paid in and the interest on the bonded debt and one per cent. yearly to a sinking fund on said debt, "*then*," as provided by section 27, "the Trustees of the Internal Improvement Fund may apply, under the direction of the Legislature, the annual income arising from said fund to other purposes of Internal Improvement," &c. So it will be seen that it was not the design to absorb the whole fund in aiding the designated improvements to the exclusion of all others, but only to postpone all others till those first designated should have been put into successful operation. This we clearly think the General Assembly had the right to do.

But it was also objected to the act of 1855, that it is in violation of the Act of Congress ceding the lands composing

the Internal Improvement Fund to the State of Florida.—
We will not discuss this question; it is enough for us to
know that the Trustees, the Appellants here, derive their
existence entirely from the Act of 1855. They are its crea-
tures and cannot be heard to complain that the author of
their being did not give them greater powers or less, or did
not frame them in anywise different from what they are.—
They must execute the law as they find it, and if they deem
it so fraught with folly, fraud or injustice, that they cannot
consent to superintend its operations, we know of no escape
for them except in resignation.

It was further objected against the Act of 1855, that the
power reposed by the Constitution in the Legislature, over
the lands composing the Internal Improvement Fund, could
not be delegated to the Trustees, it being a matter of per-
sonal confidence and discretion, but as we have before stated,
the Trustees, the Appellants, cannot be heard to impeach
the very act which gives them existence, and besides, if they
could succeed in showing that the General Assembly of 1855
could not delegate the powers contained in that act, would
they not show at the same time that the General Assembly
of 1861 could not delegate similar powers in the very act
under which they claim the right to make the appropriation
complained of? It seems to us that this alone is sufficient
answer to this objection. But we will state further on this
head, that the State can contract and be contracted with,
and carry on the operations of her government only through
the instrumentality of her agents, and of course her Legisla-
ture must have authority to delegate to her agents such
powers as will enable them to carry out her constitutional
wishes. No better illustration of this can be found than that
afforded by the case before us. The Legislative Department
is required by the Constitution " to encourage a liberal sys-
tem of Internal Improvements," to " ascertain proper objects

of improvement and to provide for a suitable application of such funds as may be appropriated for such improvements." How could these requirements of the Constitution be complied with except by delegating the necessary powers to trustees or agents? It is impossible.

We conclude, therefore, after mature reflection on the first point, that the General Assembly of 1855 did have the power and right under the Constitution to pass the Internal Improvement Act of that year; that they did have the power and right to convey the lands and money composing the Internal Improvement Fund to Trustees to be held in pledge, mortgage, or trust, for the payment of the interest of the bonds authorized by said Act, and the other purposes therein enumerated.

Nor can we persuade ourselves that the General Assembly of 1861 had the power to interfere in the slightest degree with any rights which have become vested under the Act of 1855. By that act, all the Internal Improvement Fund is conveyed to Trustees for certain purposes therein named, among which is the payment of the interest on certain bonds, such as those now held by the Appellee. And now that said bonds have been issued and have passed for a valuable consideration into the hands of bona-fide holders who have taken them from motives of patriotism, and upon the faith both of Constitutional provisions and Legislative enactments; now that our roads have been in a great measure built with the very money furnished by the holders of these bonds, and the whole State is rejoicing in the use of them, surely it would be in the last degree wrong for a subsequent Legislature to say in effect, by their act, to the bond holders, " we have gotten all out of you we wanted, we have gotten your money and built our roads with it, and now we will take the fund which we solemnly and *irrevocably* pledged to the pay-

ment of your interest and appropriate it to the making of other improvements." But such is not the law. The State is as capable of making a contract as an individual is, and when made is as much bound by it.

The Legislative Department can constitutionally pass no law impairing the obligation of her contracts, and when it attempts to do so, it is the solemn duty of the Judicial Department, co-equal and co-ordinate with the Legislative, each being supreme in its own sphere in the constitutional system, to declare such law null and void.

When the General Assembly of 1855 conveyed the Internal Improvement Fund to Trustees for the benefit of the purchasers and holders of the bonds to be issued under it, and for the other purposes therein named, they made a law in the nature of a contract, and the Supreme Court of the United States, in Fletcher vs. Peck, 6 Cranch 87, say : " When then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot divest those rights." [See also Ferrett vs. Taylor, 9 Cranch, and Winter vs. Jones, 10th Ga., 190.]

The Act of 1861 is an attempt to repeal the act of 1855, in so far as it seeks to divest the Internal Improvement Fund from the purposes therein indicated, which, as we have shown, cannot be done, since rights have become vested under it.

The next question in order is, would the appropriation sought to be enjoined be in derogation of the right of the complainant as a bond holder under the act of 1855? We think it would. The clearing out and improving the channel of the Apalachicola river is not one of the Internal Improvements designated in said act. All the fund having been appropriated, for the present, to the purposes mentioned in the act, it follows of course, that the rights of those who have purchased bonds on the faith of that appropriation

would be violated if any portion of the fund should be applied to any other purpose so as to endanger their security.

But it has been argued that the Internal Improvement Fund is a vast one, consisting originally of about twelve millions of acres, and that the portion which the Trustees are about to appropriate to another object is so small as not to effect the safety of the bond holders. We are not satisfied of this. An exhibit in the case shows that the amount of bonds already issued under the Act of 1855 is $3,512,860. We are not informed how much has been appropriated to the Indian River Canal, nor are we informed how much it will take to clear out the Apalachicola river, whether twenty, fifty or a hundred thousand dollars, but we are inclined to think, from the figures before us, that no money can at present be spared from the Internal Improvement Fund for other purposes than those indicated in the Act of 1855; and besides, this is not a question of ability, but of principle, for. if it be once conceded that the fund may be applied to other purposes than those named in the Act, there will be no limit, and in a short time we should probably see the whole fund frittered away on a thousand local enterprises, and the object of the Constitution in requiring a *system* of Internal Improvements to be adopted would be entirely defeated.— Instead of having that great Constitutional *system* which was designed by James T. Archer, one of the purest men and brightest intellects that ever adorned and blessed the State, in conjunction with other great men whose names may be associated with his after death; instead of that *system* which has enabled the State of Florida, the weakest in population among her sisters, to build more Railroad in the same length of time than any other State in the world; instead of that system which in a few years has connected by railway, Jacksonville with Quincy, Tallahassee with St. Marks, and Fernandina with Cedar Keys, which is rapidly

opening the Canal between the Indian and St. Johns rivers, and has graded the road in the direction to Tampa as far as Ocala, and promises in a short time after peace shall again smile on our land to complete the road to Tampa in the South, and Pensacola in the West, and then leave a fund sufficient to make all other improvements in the State that may be desirable; instead of this *system* which has done so much and promises to do so much more, if we permit the fund to be applied to new, disjointed, fragmentary enterprises, unconnected with *any* system, we shall see the whole fund exhausted, nothing great accomplished, and our Constitution, together with the pledged honor of the State to bond holders, violated.

The only question remaining is whether the Complainant has a right to the remedy by injunction prayed for against the Trustees? It has been argued that he has not, because the Trustees represent the State, which cannot be sued. It is true the State cannot be sued, but where the State appoints an Agent or Trustee to pay a particular debt, or class of debts, with a specific fund, it has never yet and never can be held that the party interested in the fund may not intervene by injunction to prevent such agent from appropriating the fund to an entirely different purpose. Such is the case here.

The General Assembly has, in compliance with the express command of the Constitution, inaugurated a liberal system of Internal Improvements, has ascertained by law proper objects for improvement, has appropriated certain funds for those improvements, and has provided for a suitable application of those funds to said improvements by placing the funds in the hands of the Trustees, the Appellants, with strict injunctions to that effect. One of the specified purposes for which the Trustees hold the fund is the payment of the interest on the bonds held by Appellee, and when he sees

the Trustees about to apply those funds to other purposes than those specified in the act of conveyance, so as to endanger his claim, by lessening his security, it is his undoubted right to have them restrained from doing so by injunction, and this, even though the threatened misappropriation should be under the command of a subsequent Act of the General Assembly itself.

Let the decree of the Circuit Court be affirmed with costs.