409 So.2d 7 (1981)
Reubin O'D. ASKEW, et al., Appellants,
v.
Stephen R. SONSON, et Ux., Appellees.
No. 53843.
Supreme Court of Florida.
July 23, 1981.
Rehearing Denied February 18, 1982.
Jack W. Pierce, Tallahassee, and Henry Dean, Gen. Counsel, S. Sherman Weiss, Richard P. Ludington, Director, Division of State Lands, Dept. of Natural Resources/Bd. of Trustees of the Internal Improvement Trust Fund, Tallahassee, for appellants.
Kenneth L. Ryskamp of Goodwin, Ryskamp, Welcher & Carrier, Miami, for appellees.
Jim Smith, Atty. Gen., J. Kendrick Tucker, Deputy Atty. Gen., and David K. Miller, Asst. Atty. Gen., Tallahassee, for Attorney General, amicus curiae.
Paul J. Stichler, Orlando, for Lawyers' Title Guaranty Fund, amicus curiae.
J. Richard Harris of Scott, Burk, Royce, Harris & Loucks, Palm Beach, for the Real Property, Probate and Trust Law Section of The Florida Bar, amicus curiae.
Jim Smith, Atty. Gen., David K. Miller, Asst. Atty. Gen., and Herbert D. Sikes, Tallahassee, for State Bd. of Ed., amicus curiae.
Peter Guarisco, Tallahassee, for Florida Land Title Ass'n, Inc. and Florida Title Underwriters Bureau, amicus curiae.
Chesterfield Smith and Wofford H. Stidham of Holland & Knight, Tallahassee, for Mobil Oil Corp., amicus curiae.
ADKINS, Justice.
This is a direct appeal from a partial summary final judgment quieting title in favor of appellees (hereinafter referred to as plaintiffs) against the appellants (hereinafter referred to as defendants) based upon the application of the Marketable Record Title Act (chapter 712, Florida Statutes).
Plaintiff's complaint alleged their "root of title" had remained of record and unchallenged for a period in excess of thirty years and requested that the court foreclose any claim of defendants as Trustees of the Internal Improvement Fund. Defendants, by affirmative defenses, contended that the application of the Marketable Record Title *8 Act against defendants would be unconstitutional since the lands involved were section sixteen lands which are designated for school purposes. The summary judgment entered for plaintiffs rejected defendants' argument that chapter 712, Florida Statutes, was unconstitutional as applied to the facts of the case and the land in question, and extinguished defendants' claims. This appeal resulted. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. (1972).
The land involved was granted to the state by act of Congress in 1845, the year Florida was admitted to the Union. In 1917 drainage taxes were assessed against the property by the Southern Drainage District pursuant to chapter 7599, Laws of Florida, Acts of 1917. The land was sold to the District for the taxes due. This tax sale was held invalid under a previous decision of this Court. Southern Drainage District v. State, 93 Fla. 672, 112 So. 561 (1927).
Plaintiffs' claim is not based upon the tax sale. The "root of title" goes back to the following: A warranty deed from Edwards to Malon Holding Company in 1926; a warranty deed from West to McKool in 1928; and a warranty deed from Lawrence to McKool in 1927. Since the last "root of title" no instrument contradicting plaintiffs' claim has been placed of record for more than thirty years and no notice of claim pursuant to section 712.05, Florida Statutes (1975), has been filed by the defendants which would protect their rights under the Marketable Record Title Act.
The purported unconstitutional proceedings against school lands for the collection of drainage taxes (which resulted in the tax sale) were concluded in 1922. If the root of title in the instant case was based upon a "wild deed" the prior tax proceedings would be rendered irrelevant. We have held that "initially void tax title claims" can ripen into incontestable title through the Marketable Record Title Act. See Marshall v. Hollywood, Inc., 236 So.2d 114 (Fla.), cert. denied, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970).
We must determine whether the Marketable Record Title Act may constitutionally divest the state of title to lands which were granted for school purposes, including the sixteenth section in each Township.
After deliberating on this issue we decided to request additional briefs on the following question: "Are state properties affected by the marketable record title act, and if so, what categories are affected?"
We were furnished excellent briefs by amici curiae and the parties. The order requesting additional briefs restated and broadened the questions initially presented, so as to include the application of the marketable record title act to all state lands, of which section sixteen lands are merely one category. The question framed by the Court encompasses all categories of state properties, including sovereignty lands. Among the other categories of state properties are internal improvement lands, swamp and overflow lands, railroad lands, indemnity lands, and Murphy Act lands. The amici curiae urge the Court to reserve ruling on those arguments until they are presented in the context of a proper controversy. In other words, they urge us to confine our ruling to the question initially presented.
It is a wise rule that courts will only determine issues which are based on a genuine controversy, supported by a sufficient factual predicate. This rule is particularly appropriate where complex issues of great public interest are concerned. This Court has stated that it will not address issues, particularly those of constitutional import, which are neither directly presented nor necessary to the resolution of the dispute at hand. See e.g., Pace v. King, 38 So.2d 823, 827 (Fla. 1949); W.S. Badcock Corp. v. Kunze, 126 Fla. 725, 171 So. 657, 658 (1936). See also Daggett v. Willey, 6 Fla. 482, 511-512 (1855).
Chapter 78-288, Laws of Florida, amended chapter 712 (marketable record title act, hereinafter referred to as MRTA), so as to provide that the MRTA should not affect or extinguish "[s]tate title to lands beneath navigable waters acquired by virtue of sovereignty." § 712.03(7), Fla. Stat. (Supp. 1978).
*9 It is clear that in no case does the MRTA serve to protect a private party's title to sovereignty lands if title had not been perfected prior to the effective date of the 1978 amendment. We do not now pass on the question of whether a private owner's title to what had been sovereignty lands could be perfected by the MRTA prior to the effective date of the 1978 amendment. See Odom v. Deltona Corp., 341 So.2d 977, 988 (Fla. 1976).
In the case we are now considering we limit our discussion to the question of whether the MRTA may constitutionally divest the state of title to lands which were granted for school purposes, including the sixteenth section in each township.
By an act of Congress on March 3, 1845, entitled "An Act Supplementary to an Act for the Admission of Florida and Iowa into the Union, and for Other Purposes," the state of Florida was granted the sixteenth section in every township for the use of the inhabitants of such township for the support of public schools. This grant was made in consideration of concessions made by the state of Florida.
The grant contained a provision for giving other land in lieu of the sixteenth section. Prior to the grant, portions of the territory of Florida had been encumbered in the Articles of Cession and other portions by Congress in the fulfillment of public obligations. This interfered with the general policy of setting apart the sixteenth section for school purposes.
In some instances, settlements with a view to preemption or homestead had been made in the sixteenth section; some of the sixteenth sections were mineral land or embraced within a military, Indian, or other reservation; and some sixteenth sections were fractional in quantity, or wanting by reason of the township being fractional, or from natural cause. For these reasons Congress passed what is known as the "Lieu Land Statute" which authorized the state to select unappropriated government lands in lieu of the deficiency in the short sections. See 43 U.S.C.A. § 851 (1976); Hampton v. Matheson, 121 Fla. 768, 164 So. 714 (1935).
By an act of the legislature, section 6.01, Florida Statutes, approved July 25, 1845, the state assented to the terms of admission into the union and to the provisions of the acts of Congress respecting the public lands of the United States in this state. When, by survey, a sixteenth section, or fractional part thereof, was ascertained to exist in any township, the grant immediately attached thereto without a patent and related back to the date of the act of Congress. State ex rel. Kittel v. Jennings, 47 Fla. 302, 35 So. 986 (1904).
This grant of school lands was an absolute grant, vesting title in the state of Florida. The nature of the title was discussed in Hampton v. State Board of Education, 90 Fla. 88, 105 So. 323 (1925). This was a suit by Hampton against the State Board of Education seeking specific performance of a contract to sell school lands. The Court held that the suit was predicated directly upon a contract made by state officers representing the state and was in effect a suit against the state without its consent. The suit was therefore properly dismissed. The Court, in its opinion, said:
By sections 602, 603 and 3798, Revised General Statutes, 1920, the state retains the title to all state school lands and merely authorizes the state board of education to take possession of, to manage, to preserve and to fix the terms of sale, and to convey the title to "all lands granted to or held by the state for educational purposes." Under these statutes the title remains in the state and the state officers have no title, but a mere power of agency to sell the lands, not for trust purposes of an administrative nature, but such sales are for "the principal of the state school fund" which "shall remain sacred and inviolate." Sections 4 and 5, art. 12, Constitution. In view of these organic and statutory provisions, a suit brought against the state officers to enforce a contract for the sale of state school land, is in effect a suit against the state, since it relates to land the title to which is in the state for the benefit of a "sacred and inviolate" school fund, and *10 the state has not by statute directed the contract to be made, and has not by law authorized a suit against the state.
105 So. at 327.
Whitfield's Notes-Division II, Governmental, Legal, and Political History of Florida, Florida Statutes, Volume III, Helpful and Useful Matter (1941), contains a discussion of the origin of land titles in Florida. The following discussion relates to the "state school fund":
The constitution of 1868 provided that "the common school fund * * * * * shall be derived from the following sources: The proceeds of all lands that have been or may hereafter be granted to the State by the United States for educational purposes; * * * * * twenty-five per centum of the sales of public lands which are now or may hereafter be owned by the State;" and that "the principle of the common school fund shall remain sacred and inviolate." (§§ 4, 6, art. VIII, const. 1868). The constitution of 1885 makes the same provision as to the state school fund. (§ 4, art. XII, const.). On October 22, 1907, the state board of education adopted a resolution calling upon the trustees of the internal improvement fund to account to the school fund for twenty-five per cent of the proceeds from sales of public lands made by the trustees.
On February 6, 1908, Attorney General William H. Ellis rendered to Governor Napoleon B. Broward an opinion that "The term `public lands' as used in the constitutions of 1868 and 1885, designated a class of lands distinguished from those granted by the United States to the State of Florida for public school purposes, all the proceeds of the sales of such lands constituting part of the School Fund, while only twenty-five per cent of the proceeds of the sales of `public lands' * * was to be paid into the School Fund. The public lands consisted, among others, of the sixteenth section in every township granted by Act of Congress of March 3, 1845, for school purposes; five hundred thousand acres granted by Act of Congress of September 4, 1841 for Internal Improvement, and the swamp and overflowed lands granted by Act of September 28, 1850. * * * * * The lands designated in the Act of 1855, Chapter 610, Laws of Florida, did not lose their character as public lands by being pledged in trust to aid in the construction of certain objects of improvement. The legislature by that act simply designated some object of improvement to be constructed first and to postpone others * * * * * Section 4, Article VIII, Constitution of 1868, which was carried into and became a part of the Constitution of 1885, so far as it provides that the Common or State School Fund should consist in part of the twenty-five per cent of the sales of public lands which were then owned or thereafter acquired by the State, operated as an amendment to Chapter 610, Laws of Florida * * * * * and is a limitation or inhibition upon the Legislature from diverting more than seventy-five per cent of the sales of the public lands designated in the act to purposes other than increasing the Common or State School Fund. Section 4, Article VIII, Constitution of 1868, was not applicable to the sales of the lands which were sold for the purpose of discharging the lien of the bondholders of the railroads which acquired the right of the provisions of the act prior to 1868. The constitutional provisions could not, of course, have the effect of impairing the obligations of contracts nor depriving those persons of vested rights acquired under an Act of 1855." (Citing, Newhall v. Sanger, 92 U.S. 761, 23 L.Ed. 769; 10 Fla. 112, 125; Gormley v. Bunyan, 138 U.S. 623, text 625, 11 S.Ct. 453 [454,] 34 L.Ed. 1086; Trustees I.I. Fund v. St. Johns Ry. Co., 16 Fla. 531).
In an opinion rendered January 3, 1920, by Glenn Terrell, as counsel for the trustees of the internal improvement fund, it is held: (1) that the "public lands" of the state are those state lands that are open to sale and disposition under general laws, citing Bardon v. Northern Pac. R. Co., 145 U.S. 535, text 538, 12 S.Ct. 856 [857,] 36 L.Ed. 806; and Newhall v. Sanger, 92 U.S. 761, 762, 23 L.Ed. 769; (2) *11 that at the date of the adoption and ratification in 1868, of the organic provisions that the school fund "shall be derived from the following sources: The proceeds of all lands * * * * * granted to the State by the United States for public school purposes * * * * * twenty-five per centum of the sales of public lands * * * * * owned by the State," the only public lands owned were those held under grants by congress (a) of the sixteenth sections of lands for school purposes, (b) of lands for internal improvement purposes, (c) of swamp and overflowed lands; (3) that in adopting and ratifying the quoted provision as to twenty-five per cent of the sales of public lands, the convention and the electors could have had in mind no other lands than the internal improvement lands and the swamp and overflowed lands, since the whole of the sixteenth sections belonged to the state school fund; (4) that the state could apply to the state school fund twenty-five per cent of the sales of the internal improvement lands and the swamp and overflowed lands in the absence of objection by the United States, the grantor of such lands; (5) that the statutory vesting of the title of the internal improvement lands and the swamp and overflowed lands in public officers as trustees, was subject to future changes in the law and the beneficial ownership of the lands remained in the state; (6) that the organic provision operated as a self executing amendment of the statute, chapter 610, laws of Florida, defining the trust purposes of the lands vested in the state trustees; (7) that since the constitution of 1868 became effective the state school fund is entitled to receive twenty-five per cent of the internal improvement lands and of the swamp and overflowed lands held by the state trustees, provided no obligations or vested right against the internal improvement fund that existed prior to the effective date of the constitution of 1868 is thereby impaired. (Citing, Mills County v. Burlington & M.R. Co., 107 U.S. 557, 565, 2 S.Ct. 654 [661,] 27 L.Ed. 578; Hagar v. Reclamation Dist. No. 108, 111 U.S. 701, 4 S.Ct. 663, 28 L.Ed. 569; U.S. v. State of Louisiana, 127 U.S. 182, 187, 8 S.Ct. 1047 [1050,] 32 L.Ed. 66; American Emigrant Co. v. Adams County, 100 U.S. 61, 25 L.Ed. 563; Trustees of Internal Imp. Fund v. Root, 59 Fla. 648, 51 So. 535; Trustees of Internal Imp. Fund v. Bailey, 10 Fla. 112, 125, 81 Am.Dec. 194; Lainhart v. Catts, 73 Fla. 735, 75 So. 47).
Lands under bodies of navigable waters and tide lands in the state, known as sovereignty lands, belong to the state; and statutes may require all as well as twenty-five per cent of the proceeds of permissible sales of such sovereignty lands to be paid into the state school fund, that "shall remain sacred and inviolate." Chapter 12016, acts 1927, relating to the internal improvement fund, expressly recognizes the organic right of the state school fund to receive twenty-five per cent of all sales of internal improvement lands and of swamp and overflowed lands held by the trustees of the internal improvement fund.
Id. at 236-37.
In adopting the constitution of 1968, the people of the state of Florida obviously recognized that the purposes of the section sixteen grant had been accomplished and deleted from the 1968 constitution reference to the grant as a source of the state school fund. The only reference to the state school fund is in article IX, section 6, Florida Constitution (1968):
The income derived from the state school fund shall, and the principal of the fund may, be appropriated, but only to the support and maintenance of free public schools.
Although the source of these lands was a grant from the United States government, once the lands vested in the state of Florida, the state was authorized to deal with these lands in any manner not inconsistent with the Florida Constitution. In 63 Am.Jur.2d, Public Lands, § 107 (1972), it is said:
Following a grant, the lands and the proceeds thereof are under the control of the state legislature, and it may deal with *12 them in any manner not inconsistent with the express commands of the state constitution. Through properly designated boards or officers it may control and manage the lands, and in a proper case they may be sold, or leased. As trustee, the state is required to administer the trust estate under the rules of law applicable to trustees acting in a fiduciary capacity.
(Footnotes omitted.)
The only provision in the Florida Constitution relating to the disposition of public lands is found in article X, section 11, Florida Constitution (1968), which reads as follows:
The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people. Sale of such lands may be authorized by law, but only when in the public interest. Private use of portions of such lands may be authorized by law, but only when not contrary to the public interest.
Sovereignty lands are not involved in this litigation, so we are not concerned with the provisions of this section of the constitution.
After the grant from the United States, all sixteen-section lands were owned by the state. By an act of the legislature, the State Board of Education was empowered to convey school lands. See section 3798, Revised General Statutes (1920). Commencing September 1, 1967, all lands held in the name of the state or any of its boards, departments, agencies, or commissions, were deemed to be vested in the Board of Trustees of the Internal Trust Fund for the use and benefit of the state. By October 1, 1967, any board, commission, department, or agency holding title to any state lands used for public purpose was required to execute all instruments necessary to transfer such title to the Board of Trustees of the Internal Improvement Trust Fund. Lands which reverted to the state under the commonly known "Murphy Act" for non-payment of taxes were excepted from this statute. § 253.03(6), Fla. Stat. (1979).
The state of Florida acquired a fee simple title to the lands and the legislature had the sole power of disposition of the lands. State officers vested with power to direct, control, and dispose of the public lands of the state can exercise the power vested in them only in accordance with the state constitution and statutes and not otherwise. See Thompson on Real Property (1978), Vol. 5B, § 2720, page 364.
It is argued that it would be unconstitutional to apply the MRTA to section sixteen school lands. This Court has previously considered an argument that the application of the MRTA to constitutionally protected homestead interests would be unconstitutional. In ITT Rayonier, Inc. v. Wadsworth, 346 So.2d 1004 (Fla. 1977), we rejected this argument. In the opinion we quoted with approval from ITT Rayonier v. Wadsworth, 386 F. Supp. 940, 943 (M.D.Fla. 1975) as follows:
Section 712.03 delineates specifically the interests which are not subject to extinction by the Act, and the statutory interest of homestead beneficiaries which vested prior to the root of title is not among them. Thus, the only reasonable assumption to be drawn from the express terms of the Act is that the Legislature did not intend to except therefrom such interests of persons claiming under the homestead statute (now F.S.A. § 731.27).
The attorney general also argues that estoppel acts such as the MRTA should not apply to the state of Florida but should apply only to private citizens. This Court held to the contrary in Daniell v. Sherrill, 48 So.2d 736 (Fla. 1950), where the facts of the case raised an equitable estoppel against the state in a suit to quiet the title to land as against parties claiming under tax deeds issued by the state.
In Trustees of Internal Improvement Fund v. Bass, 67 So.2d 433 (Fla. 1953), swamp and overflow lands were erroneously placed on the tax rolls. The lands were sold for delinquent taxes in 1908. The Trustees of the Internal Improvement Fund *13 brought ejectment proceedings against the grantee of the tax deed holder. This grantee acquired title in 1941 and had been in possession for eleven years, fencing and improving the property, as well as paying taxes each year. We held that, even though the grantee's title was not good by adverse possession, the state was estopped to question it. See also Lobean v. Trustees of the Internal Improvement Fund, 118 So.2d 226 (Fla. 1st DCA 1960).
There are no provisions in the Florida Constitution which prohibit the Florida legislature, in some instances, from subjecting the state to the same laws it imposes on the people. The legislature has made the statute of limitations applicable to the state. § 95.011, Fla. Stat. (1977). It has not excluded the state from the recording act. A 1977 statute required all laws which purport to convey title to real property from one government agency or political subdivision to another to be recorded in the public records of the county or counties in which the property is located. § 695.015, Fla. Stat. (1977).
In City of Miami v. St. Joe Paper Co., 364 So.2d 439 (Fla. 1978), we described the MRTA as follows:
The Marketable Record Title Act is a comprehensive plan for reform in conveyancing procedures. It is a curative act in that it may operate to correct certain defects which have arisen in the execution of instruments in the chain of title. Curative statutes reach back on past events to correct errors or irregularities and to render valid and effective attempted acts which would be otherwise ineffective for the purpose the parties intended. They operate to complete a transaction which the parties intended to accomplish but carried out imperfectly.
The Marketable Record Title Act is also a statute of limitations in that it requires stale demands to be asserted within a reasonable time after a cause of action has accrued. It prescribes a period within which a right may be enforced.
The Marketable Record Title Act is also a recording act in that it provides for a simple and easy method by which the owner of an existing old interest may preserve it. If he fails to take the step of filing the notice as provided, he has only himself to blame if his interest is extinguished. The legislature did not intend to arbitrarily wipe out old claims and interests without affording a means of preserving them and giving a reasonable period of time within which to take the necessary steps to accomplish that purpose.
(Emphasis added.) We held the MRTA to be constitutional.
Under our constitution the legislature is not prohibited from making the Marketable Record Title Act applicable to the state. Whether it has done so must be determined from the act.
In 1963 the legislature enacted the Marketable Record Title Act for the express purpose of simplifying and facilitating land title transactions by allowing interested parties to rely on a record title as described in the act. The legislature expressly directed that the act be liberally construed to effect the legislative purpose of simplifying and facilitating land title transactions by allowing persons to rely on a record title "as described in s. 712.02 subject only to such limitations as appear in s. 712.03." § 712.10, Fla. Stat. (1977). Section 712.01, Florida Statutes (1977) reads as follows:
As used in this law:
(1) The term "person" as used herein denotes singular or plural, natural or corporate, private or governmental, including the state and any political subdivision or agency thereof as the context for the use thereof requires or denotes.
(Emphasis added.) By including the state and any political subdivision or agency thereof as a "person" the legislature clearly intended for the MRTA to affect state properties as well as that of private citizens.
The interests extinguished by the MRTA are described in section 712.04, Florida Statutes (1977), which reads as follows:
Subject to the matters stated in s. 712.03, such marketable record title shall be free and clear of all estates, interests, *14 claims or charges whatsoever, the existence of which depends upon any act, title transaction, event or omission that occurred prior to the effective date of the root of title. All such estates, interests, claims or charges, however denominated, whether such estates, interests, claims or charges are or appear to be held or asserted by a person sui juris or under a disability, whether such person is within or without the state, whether such person is natural or corporate, or is private or governmental, are hereby declared to be null and void, except that this chapter shall not be deemed to affect any right, title or interest of the United States, Florida or any of its officers, boards, commissions or other agencies reserved in the patent or deed by which the United States, Florida or any of its agencies parted with title.

(Emphasis added.) One important exception for governmental entities is any right, title, or interest reserved in the patent or deed by which it parted with the title. Section sixteen lands, or school lands, could not be included in this exception or the exceptions to marketability listed in section 712.03, Florida Statutes (1977).
In Sawyer v. Modrall, 286 So.2d 610, 613 (Fla. 4th DCA 1973), cert. denied, 297 So.2d 562 (Fla. 1974), the court said:
With reference to § 712.04, all interests, whether they are private or governmental, are void except and only where any right, title or interest is reserved in the deed. The 1890 deed from the Trustees was outside plaintiff's thirty year chain of title and contained no reservation in the deed. It is the defendant's contention that we should read § 712.04 as to include implied state governmental reservation of title to sovereign lands. In our view, and considering the purposes of the statute and the provision that it should be "liberally construed to effect the legislative purpose of simplifying and facilitating land title transactions by allowing persons to rely" on a record title, the statute should be interpreted so as to require an explicit reservation on the state's part.

(Emphasis added.)
In Odom v. Deltona Corp., 341 So.2d 977, 989 (Fla. 1977), this Court said:
It seems logical to this Court that, when the Legislature enacts a Marketable Title Act, as found at Chapter 712, Florida Statutes, clearing any title having been in existence thirty years or more, the state should conform to the same standard as it requires of its citizens; the claims of the Trustees to beds underlying navigable waters previously conveyed are extinguished by the Act. Stability of titles expressly requires that, when lawfully executed land conveyances are made by public officials to private citizens without reservation of public rights in and to the waters located thereon, a change of personnel among elected state officials should not authorize the government to take from the grantee the rights which have been conveyed previously without appropriate justification and compensation. If the state has conveyed property rights which it now needs, these can be reacquired through eminent domain; otherwise, legal estoppel is applicable and bars the Trustees' claim of ownership, subject to rights specifically reserved in such conveyances.
(Footnotes omitted).
After Odom v. Deltona Corp., supra, subsection (7) was added to section 712.03, Florida Statutes (1977), so that state title to land beneath navigable waters acquired by virtue of sovereignty was excepted from the provisions of the MRTA. Thus, with the adding of subsection (7), the legislature, for the first time, made an exception for state lands, and then only for submerged lands beneath navigable waters acquired because of sovereignty. The essence of the MRTA is that if a person, as defined in section 712.01, Florida Statutes, holds a chain of title going back over a period of thirty years and no other person or governmental entity has filed a notice of claim to the property during the thirty-year period, then all conflicting claims based upon any *15 title transaction prior to such thirty-year period are extinguished. The only exceptions to the MRTA not extinguished are those found in section 712.03 and 712.04, Florida Statutes (1977). The lands involved in this litigation are not included in these exceptions.
Appellants rely upon Board of Public Instruction of Dade County v. Little River Valley Drainage District, 119 So.2d 323 (Fla.3d DCA 1960), to the effect that public school lands are not subject to execution or levy for improvement liens. This decision has no applicability to the facts in the case under consideration. The Sonsons are not presenting a claim based upon a tax sale, but upon "roots of title" which have remained unchallenged for over thirty years.
Appellants' reliance upon State v. New Orleans Land Co., 143 La. 858, 79 So. 515, cert. denied, 248 U.S. 577, 39 S.Ct. 19, 63 L.Ed. 429 (1918), is misplaced since that case dealt with the validity of an execution sale on school lands after the creditor had reduced its claim to judgment. The question of judicial sales is not involved in this appeal since the Sonsons' root of title does not include the judicial sale.
The task of defining which state lands, if any, are to be excluded from the operation of the MRTA is a legislative function in view of the clear language and purpose of the act. In addition to amending the MRTA in 1978 to provide an exception for sovereignty lands, the legislature at the same session enacted chapter 78-301, Laws of Florida, creating a state land study committee. It is apparent that the legislative branch of government has come to grips with the issues resolved by this Court in prior MRTA decisions and has left the framework of the act intact. Substantive rules governing the law of real property are peculiarly subject to the principles of stare decisis. United States v. Title Insurance and Trust Company, 265 U.S. 472, 44 S.Ct. 621, 68 L.Ed. 1110 (1924); Alta-Cliff Co. v. Spurway, 113 Fla. 633, 152 So. 731 (Fla. 1933). The legislative experience and the doctrine of stare decisis mandate the answer that the MRTA extinguishes the state's interest in the section sixteen school lands in question. The decision of the lower court is affirmed.
BOYD, ALDERMAN and McDONALD, JJ., concur.
SUNDBERG, C.J., concurs in result only.
OVERTON and ENGLAND, JJ., dissent.

MOTION FOR REHEARING
Upon consideration of the Motion for Rehearing filed by attorneys for Appellants,
IT IS ORDERED by the Court that said motion be and the same is hereby denied.
SUNDBERG, C.J., and ADKINS, BOYD, ALDERMAN and McDONALD, JJ., concur.
OVERTON, J., dissents with an opinion.
OVERTON, Justice, dissenting.
I would grant rehearing and vacate our original opinion. I initially dissented to the majority opinion without explaining my reasons, but now I believe on rehearing it is necessary to express my views so that the legislature may have a better perspective of a contrary interpretation of Florida's Marketable Record Title Act when making a determination of whether corrective legislation is necessary to protect state-owned section sixteen lands.
The majority opinion construes the Marketable Record Title Act (MRTA) in a manner which allows the state to be stripped and divested of its title to section sixteen lands without any action or conveyance on the state's part, other than the legislature's initial passage of the act itself. In my view, this is totally contrary to the trust for which the United States Government granted these lands to the State of Florida. I find no legislative intent for MRTA to be used as an instrument of conveyance of unidentified section sixteen lands to individual owners unknown to the state, who, by happenstance, are the beneficiaries of a thirty-year-old interloper deed as root of title.
*16 As expressed in the majority opinion, Florida received section sixteen lands from the federal government in 1845, the date of Florida's admission into the Union, to be held in trust for the people. The land grant was to benefit the public school system and the proceeds from any sale of these lands was strictly for public school purposes. This Court has previously and clearly held that title to section sixteen lands is vested in the state for the benefit of the "sacred and inviolate" school fund, and that state officials may not convey such lands without a statute expressly directing such for school benefit. See Hampton v. State Board of Education, 90 Fla. 88, 105 So. 323 (1925).
In these proceedings, the state argues that the lands claimed by respondent were never conveyed out of the public domain, and that, in accordance with the purpose behind section sixteen lands, title remains in the State of Florida. This view is supported by all evidence of title which remains presently in the public land office established by the trustees of the internal improvement trust fund at Tallahassee. See § 253.031, Fla. Stat. (1979). I totally agree with this argument.
To say that the questioned lands have, in fact, been conveyed by the operational effect of MRTA is not, in my view, a reasonable interpretation of that act, particularly when another reasonable construction exists which does not defeat the act's purpose. I recognize the purpose of MRTA is to simplify land title transactions and to allow reliance upon roots of title in existence for thirty years or more. And I agree that the act applies to lands that the state previously conveyed, even if it did so erroneously, such as swamp and overflow lands or Murphy Act Deed properties. See, e.g., Odom v. Deltona Corp., 341 So.2d 977 (Fla. 1977); Sawyer v. Modrall, 286 So.2d 610 (Fla. 4th DCA 1973). I cannot agree, however, that the legislature in any manner intended that MRTA apply to lands which the state never conveyed. To so interpret the act would defeat its purpose and deprive the state of funds for the benefit and support of its school system.
The portion of MRTA principally relied on by this Court's majority for its decision is section 712.04, Florida Statutes (1977), which reads as follows:
Subject to the matters stated in s. 712.03, such marketable record title shall be free and clear of all estates, interests, claims or charges whatsoever, the existence of which depends upon any act, title transaction, event or omission that occurred prior to the effective date of the root of title. All such estates, interests, claims or charges, however denominated, whether such estates, interests, claims or charges are or appear to be held or asserted by a person sui juris or under a disability, whether such person is within or without the state, whether such person is natural or corporate, or is private or governmental, are hereby declared to be null and void, except that this chapter shall not be deemed to affect any right, title or interest of the United States, Florida or any of its officers, boards, commissions or other agencies reserved in the patent or deed by which the United States, Florida or any of its agencies parted with title.
By my interpretation, the interest of "governmental" bodies extinguished by the above-quoted portion of the statute is any claim a governmental body makes after the government has initially conveyed publicly-owned land. I cannot read that section to act as an instrument which actually conveys unknown state lands to unknown persons. The exceptions contained in section 712.04 in my view prohibit such a result. I construe the section as creating three categories of exceptions to which MRTA has no application: (1) unconveyed lands of the United States which exist in Florida; (2) unconveyed lands of the State of Florida; and (3) certain governmental rights which have been expressly reserved in the patent or deed made by the United States or the State of Florida, such as the reservation of mineral rights. My construction places section sixteen lands not previously conveyed within the second exception.
*17 Further, it necessarily follows that the legislature had no intent to place unconveyed state property within the application of MRTA. For example, section sixteen lands, as well as other sovereignty lands, are only legally placed of record in the county of their location when the state, by appropriate official action, conveys the land to private or other public ownership. The lands in the instant case were never legally placed of record. Rather, they were illegally entered into the official records by an interloper deed and not by any overt act of the state. In this regard, the state is not like a private party who knows he will receive a tax bill each year, and, if he does not, knows he must investigate or subject himself to possible loss of the property through adverse possession. The state does not receive tax bills on its property. Moreover, it would be virtually impossible for the state to check the official records every year in all 67 counties to determine if any interloper deeds have been filed attempting to claim title to state-owned properties.
I strongly believe the legislature had no intent by enactment of MRTA to divest the state of its title to section sixteen lands. To do so without receiving funds for the property is a clear violation of the sacred trust for which the state has held these lands.
In view of the majority's construction of the Marketable Record Title Act, I strongly dissent and recommend that the legislature amend chapter 712 to protect all presently state-owned lands.